IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

SABAN RENT-A CAR LLC, et al.,
*Plaintiffs/Appellees/Cross-Appellants*,

*v.*

ARIZONA DEPARTMENT OF REVENUE,
*Defendant/Appellant/Appellee/Cross-Appellee*,

TOURISM AND SPORTS AUTHORITY,
*Defendant-in-Intervention/Appellant/Cross-Appellee*.

No. 1 CA-TX 16-0007
FILED 3-13-2018

Appeal from the Arizona Tax Court
No. TX2010-001089
The Honorable Dean M. Fink, Judge
The Honorable Christopher T. Whitten, Judge

**AFFIRMED IN PART; REVERSED IN PART; REMANDED**

COUNSEL

Mandel Young, PLC, Phoenix
By Taylor C. Young, Robert A. Mandel
*Co-Counsel for Plaintiffs/Appellees/Cross-Appellants Saban et al.*

Kickham, Hanley, PLLC, Royal Oak, MI
By Gregory D. Hanley, *pro hac vice*
*Co-Counsel for Plaintiffs/Appellees/Cross-Appellants Saban et al.*

Aiken, Schenk, Hawkins & Ricciardi, PC, Phoenix
By Shawn K. Aiken
*Co-Counsel for Plaintiffs/Appellees/Cross-Appellants Saban et al.*

Arizona Attorney General's Office, Phoenix
By Kimberly J. Cygan, Jerry A. Fries
*Co-Counsel for Defendant/Appellant/Appellee/Cross-Appellee ADOR*

Osborn Maledon, PA, Phoenix
By Thomas L. Hudson, Eric M. Fraser
*Co-Counsel for Defendant/Appellant/Appellee/Cross-Appellee ADOR*

Fennemore Craig, PC, Phoenix
By Timothy J. Berg, Theresa Dwyer, Emily Ayn Ward
*Co-Counsel for Defendant-in-Intervention/Appellant/Cross-Appellee AzSTA*

Dickinson Wright, PLLC, Phoenix
By Scot L. Claus, Vail C. Cloar
*Co-Counsel for Defendant-in-Intervention/Appellant/Cross-Appellee AzSTA*

Lewis, Roca, Rothgerber, Christie, LLP, Phoenix
By Robert G. Schaffer
*Counsel for amici curiae Halikowski and ADOT*

Gammage & Burnham, PLC, Phoenix
By Michael R. King, Cameron C. Artigue, Christopher L. Hering
*Counsel for amici curiae Convention and Visitors Bureaus*

Pima County Attorney's Office, Tucson
By Regina L. Nassen
*Counsel for amicus curiae Pima County*

Gallagher & Kennedy, PA, Phoenix
By Michael K. Kennedy, Mark C. Dangerfield
*Counsel for amicus curiae Arizona Chamber of Commerce*

Perkins Coie, LLP, Phoenix
By Paul F. Eckstein, Thomas D. Ryerson
*Counsel for amicus curiae City of Phoenix*

---

## OPINION

Judge Diane M. Johnsen delivered the opinion of the Court, in which Presiding Judge Lawrence F. Winthrop and Judge Maria Elena Cruz joined.

---

J O H N S E N, Judge:

¶1        A class of car-rental companies sued to invalidate a surcharge enacted to build sports facilities to be owned by the Arizona Tourism and Sports Authority ("AzSTA").  The car-rental companies argued the surcharge is invalid both under Article IX, Section 14 of the Arizona Constitution and under the Dormant Commerce Clause implied by the United States Constitution.  The tax court ruled the surcharge was invalid under the Arizona Constitution (but not under the Dormant Commerce Clause) and ordered a refund.

¶2        For reasons explained below, we reverse the tax court's order granting summary judgment to the car-rental companies under the Arizona Constitution and direct entry of judgment in favor of the Arizona Department of Revenue ("ADOR") and AzSTA on that claim.  We affirm the judgment in favor of ADOR and AzSTA under the Dormant Commerce Clause.  Because we conclude the surcharge is not invalid under either constitutional provision, we reverse the tax court's refund order.

### FACTS AND PROCEDURAL BACKGROUND

¶3        AzSTA is a "corporate and political body" the legislature created in 2000.  Ariz. Rev. Stat. ("A.R.S.") § 5-802 (2018).[1]  By statute, AzSTA's "boundaries" are those "of any county that has a population of more than two million persons," meaning (then and now) Maricopa County.  A.R.S. § 5-802(A).  The legislature directed AzSTA to build and operate a "[m]ultipurpose facility" — a stadium/events center — that could accommodate a professional football team, a college bowl game, and "other sporting events and entertainment, cultural, civic, meeting, trade show or convention events[.]"  A.R.S. §§ 5-801(4) (2018) (defining "multipurpose facility"), -804(A) (2018), -807 (2018), -815 (2018) (powers of AzSTA).  The legislature also granted AzSTA the power to contract to host the Super Bowl

---

[1]        Absent material revision after the relevant date, we cite the current version of a statute or rule.

and college football national championship and playoff games and to build Major League Baseball spring-training facilities and youth and amateur sports and recreational facilities. A.R.S. §§ 5-808 (2018), -809 (2018).

**¶4** Although AzSTA may charge for use of its facilities, it cannot levy taxes or assessments to build those facilities. A.R.S. § 5-802(C). Instead, the legislature authorized Maricopa County voters to approve taxes to fund AzSTA's construction projects. *See id*. Among the taxes the legislature authorized voters to impose is the one challenged here: A surcharge on the gross proceeds of car-rental businesses. *See* A.R.S. § 5-839(B) (2018). Maricopa County voters approved the car-rental surcharge authorized by § 5-839 in November 2000, just months after the legislature established AzSTA.[2] As authorized, the surcharge is the greater of 3.25 percent "of the gross proceeds or gross income from the business" or $2.50 per car rental, payable by the car-rental business, not the customer. A.R.S. § 5-839(B)(1). If a customer rents a vehicle as a "temporary replacement" for another vehicle, the surcharge charged the car-rental company is a flat $2.50. *See* A.R.S. § 5-839(B)(2).[3]

**¶5** In August 2009, Saban Rent-A-Car, Inc. sought a refund of amounts it had paid under § 5-839, claiming the surcharge violated Article IX, Section 14 of the Arizona Constitution and the Dormant Commerce Clause implied by the U.S. Constitution. After ADOR denied the refund and that decision was upheld on administrative review, Saban challenged the ruling in the tax court, seeking injunctive relief and a refund on behalf of a class of all similarly situated car-rental companies. The court granted AzSTA leave to intervene as a defendant, then certified a class of all

---

[2]    This court already has denied two challenges to the tax. In *Long v. Napolitano*, 203 Ariz. 247, 251-53, ¶¶ 2-9 (App. 2002), we ruled that § 5-839 did not violate provisions of the Arizona Constitution unrelated to the provision at issue in this case. *See id.* at 253, ¶¶ 10-11. In *Karbal v. ADOR*, 215 Ariz. 114, 117, ¶ 11 (App. 2007), a car-rental customer raised some of the same arguments made here against the surcharge, but we ruled that the customer lacked standing because the surcharge is imposed on the car-rental companies, not the customers.

[3]    The first $2.50 collected for each car-rental transaction goes to the Maricopa County stadium district; the remaining revenues go to AzSTA. *See* A.R.S. §§ 5-801(1), -839(G)(1), (2). The legislature also authorized Maricopa County to tax hotels at up to 1 percent of room sales to support AzSTA. A.R.S. § 5-840 (2018).

businesses that paid the surcharge from September 2005 through March 2008.

**¶6**  After discovery, the tax court ruled on cross-motions for summary judgment that although the surcharge did not violate the Dormant Commerce Clause, it was invalid under Article IX, Section 14 of the Arizona Constitution.  The court ruled that ADOR would have to refund the tax to class members but could recoup the amount of the refund, over time, from AzSTA pursuant to A.R.S. § 42-5029(G) (2018).  The court granted ADOR's motion for entry of judgment pursuant to Arizona Rule of Civil Procedure 54(b), leaving the amount of the refund to be determined.

**¶7**  We have jurisdiction of the parties' various appeals and cross-appeal from the Rule 54(b) judgment pursuant to Article VI, Section 9 of the Arizona Constitution and A.R.S. § 12-2101(A)(6) (2018).  *See Empress Beauty Supply, Inc. v. Price*, 116 Ariz. 34, 35 (App. 1977) (Rule 54(b) appropriate when "the only question remaining to be resolved is the amount of recovery") (quotations omitted).[4]

## DISCUSSION

### A. Standard of Review.

**¶8**  We review *de novo* the grant of a motion for summary judgment.  *See Tierra Ranchos Homeowners Ass'n v. Kitchukov*, 216 Ariz. 195, 199, ¶ 15 (App. 2007).  Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law."  Ariz. R. Civ. P. 56(a).  Although a party ordinarily may not appeal an order denying summary judgment, *see, e.g.*, *Fleitz v. Van Westrienen*, 114 Ariz. 246, 248 (App. 1977), the court of appeals may review the denial of a motion for summary judgment if the superior court denied the motion on a point of law, *Strojnik v. Gen. Ins. Co. of America*, 201 Ariz. 430, 433, ¶ 11 (App. 2001).

### B. Article IX, Section 14 of the Arizona Constitution.

**¶9**  In relevant part, Article IX, Section 14 of the Arizona Constitution states:

---

[4] *Empress Beauty Supply* interpreted A.R.S. § 12-2101(G), which since was renumbered to A.R.S. § 12-2101(A)(6) without substantial change.  *See Empress Beauty Supply*, 116 Ariz. at 35; H.B. 2645, 50th Leg., 1st Reg. Sess., Ariz. Laws 2011, Ch. 304, § 1.

> No moneys derived from fees, excises, or license taxes relating to registration, operation, or use of vehicles on the public highways or streets or to fuels or any other energy source used for the propulsion of vehicles on the public highways or streets, shall be expended for other than highway and street purposes . . . .

Under this provision, revenues collected from certain "fees, excises, or license taxes" may be spent only for "highway and street purposes." ADOR and AzSTA concede the surcharge authorized by A.R.S. § 5-839 is an excise tax. *See also Karbal v. ADOR*, 215 Ariz. 114, 116, ¶¶ 9-10 (App. 2007). Therefore, if the surcharge is a tax "relating to registration, operation, or use of vehicles on the public highways or streets," it violates Section 14 because its proceeds are spent on sports and recreation facilities, not highways and streets.

¶10 Relying on dictionary definitions, Saban argues the phrase "relating to" in Section 14 broadly sweeps up any tax "having connection with or reference to the operation or use of vehicles on the public highways." To be sure, the phrase "relating to" is inherently indeterminate. *See New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) ("If 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes [its scope] would never run its course, for 'really, universally, relations stop nowhere.'" (quoting H. James, *Roderick Hudson* xli (New York ed., World's Classics 1980)) (alteration in original omitted)). For that reason, as Saban conceded at oral argument, without some limiting principle, Section 14 would encompass not only the car-rental surcharge at issue here but also a broad range of taxes that Arizona does not now funnel to highways— including retail sales or business privilege taxes on car sales, tire sales, car leases and car repairs.

¶11 Nevertheless, Saban cites *Landon v. Indus. Comm'n of Ariz.*, 240 Ariz. 21 (App. 2016), for the proposition that we should look no farther than the dictionary in interpreting the words "relating to" in Section 14. The issue in *Landon* was whether the discharge of an injured employee fell within a provision of the Workers' Compensation Act concerning workers "terminat[ed] from employment for reasons that are unrelated to the industrial injury." *Id.* at 24, 25-26, ¶¶ 5-7, 15. We consulted dictionaries for the plain meaning of "related," namely "connected" to or "associated" with. *Id.* at 26, ¶ 16 (citing *Black's Law Dictionary* (10th ed. 2014) and *Webster's II New College Dictionary* (3d ed. 2005)). But we also considered the purpose of the legislation and applied common principles of statutory construction,

including the rule that "when statutory provisions relate to the same subject matter, they should be construed together and reconciled whenever possible, in such a way so as to give effect to all the statutes involved." 240 Ariz. at 25, 26, ¶¶ 12, 17 (quotation omitted).

¶12        We must use these and other like principles to discern whether Section 14 encompasses the car-rental surcharge. *See Travelers Ins.*, 514 U.S. at 656 ("We simply must go beyond the unhelpful text and the frustrating difficulty of defining its key term, and look instead to the objectives [of the statute]."); *RSP Architects, Ltd. v. Five Star Dev. Resort Communities, LLC*, 232 Ariz. 436, 438, ¶ 8 (App. 2013) (phrase "relating to" in Prompt Payment Act, A.R.S. § 32-1129(A)(1) (2018), does not encompass every relationship or connection with the referenced term: "Common sense . . . tells us there must be some bounds to the breadth of the statute."). We look to the "context, subject matter, effects and consequences, reason and spirit of the law" and try to construe it "in the context of related provisions and in light of its place in the statutory scheme." *RSP*, 232 Ariz. at 438, ¶ 9; *see Landon*, 240 Ariz. at 26, ¶ 17. And, in interpreting a voter-approved measure, we seek to give effect to "'the intent of the electorate that adopted it.'" *State v. Maestas*, 242 Ariz. 194, 197, ¶ 11 (App. 2017) (quoting *Cave Creek Unified Sch. Dist. v. Ducey*, 233 Ariz. 1, 6-7, ¶ 21 (2013)).

¶13        Applying those principles here, the broad interpretation Saban urges would render multiple phrases in the provision superfluous — a result that we must seek to avoid. *See RSP*, 232 Ariz. at 439, ¶ 13. Section 14 expressly applies not only to excise taxes "relating to registration, operation, or use of vehicles on the public highways or streets" but also to such levies on "fuels or any other energy source used for the propulsion of vehicles on the public highways or streets." Saban's broad construction of "relating to" would render the fuels provision irrelevant because fuel used to propel a vehicle is related to use or operation of a vehicle. The same is true with respect to Section 14's express reference to "registration." A vehicle's registration is related to its use on public streets; one may not legally drive a vehicle that is not registered. Because a broad interpretation of "relating to" deprives these other terms of any effect, the text of Section 14 itself reveals that we should not construe "relating to" in its broadest possible sense.

¶14        Turning to the purpose of the provision, Section 14 was enacted in response to federal legislation that conditioned grants of federal highway funds on a state's assurance that revenue "from State motor vehicle registration fees, licenses, gasoline taxes, and other special taxes on motor-vehicle owners and operators of all kinds" would be used exclusively

for highway purposes. H.R. 8781, 73rd Cong., Ch. 586, § 12, 48 Stat. 993, 995 (1934) (enacted). In an official publicity pamphlet mailed before the 1952 election, at which Section 14 was approved, voters were informed that 21 states had adopted similar "anti-diversion" laws to ensure and preserve eligibility for federal highway funds. *See State of Ariz. Initiative & Referendum Publicity Pamphlet, Proposed Amendment to the Constitution* at 4 (1952).[5]

¶15 Significantly, the pamphlet assured voters that passage of Section 14 would "entail no change in the source or expenditure of highway revenues." But at the time, Arizona already was collecting a statewide excise tax on car-rental business revenues. That tax was enacted in 1935 — 17 years before voters enacted Section 14. *See* S.B. 118, 12th Leg., 1st Reg. Sess., Ariz. Laws 1935, Ch. 77, art. 2, § 2(f)(2) (encoded as Ariz. Code Ann. § 73-1303(f)(2) (1939)) (subsequently encoded as A.R.S. § 42-1314 (1959), H.B. 41, 24th Leg., 1st Reg. Sess., Ariz. Laws 1959, Ch. 11, § 1) (repealed by S.B. 1038, 27th Leg., 1st Reg. Sess., Ariz. Laws 1985, Ch. 298, § 11); A.R.S. §§ 42-5008 (2018), -5071 (2018); *see also Alvord v. State Tax Comm'n*, 69 Ariz. 287, 289 (1950) (recounting history of Arizona's business privilege tax on car-rental services). From the inception of that statewide car-rental business tax, and at the time Section 14 was adopted, proceeds from the tax were not reserved for highway uses but went instead to the state's general fund. Ariz. Code Ann. § 73-1303 (1939) (providing for tax for "the purpose of raising public money to be used in liquidating the outstanding obligations of the state and county governments" and "to aid in defraying the necessary and ordinary expenses of the state and counties"); *see also* Ariz. Code Ann. § 73-1303 (Supp. 1952) (same). The pamphlet sent to voters in 1952 did not mention the then-existing car-rental business tax, even while telling voters of other existing taxes that would fall within Section 14's scope: "[S]tate gasoline and diesel taxes, registration fees, unladen weight fees on common

---

5       Citing *Phelps v. Firebird Raceway, Inc.*, 210 Ariz. 403 (2005), Saban argues we may not use the voter pamphlet in interpreting Section 14. But the majority in *Phelps* held the constitutional provision at issue there was so plain it required no interpretation. *Id.* at 405, ¶ 10. We may rely on voter pamphlets to determine the electorate's intent when necessary to resolve ambiguity. *See, e.g., Calik v. Kongable*, 195 Ariz. 496, 500-01, ¶¶ 17-19 (1999); *Laos v. Arnold*, 141 Ariz. 46, 47-48 (1984). Such a pamphlet assists us in ascertaining an "interpretation . . . consistent with the purpose" of the measure "as communicated to the people of Arizona." *Cave Creek Unified Sch. Dist.*, 231 Ariz. at 351, ¶ 25.

and contract motor carriers, and motor carrier taxes based on gross receipts."

**¶16** Further, echoing the federal statute's focus on "motor-vehicle owners and operators," the pamphlet told voters that the purpose of the constitutional measure was "to INSURE THE EXPENDITURE OF ALL REVENUES DERIVED FROM ROAD USERS TO ROAD USES ONLY." Consistent with that focus on tax collections from road users, Arizona puts into its Highway Fund the proceeds of fees or taxes that must be paid in order to legally drive on public roads — motor carrier taxes, vehicle registration and in lieu fees and driver's license fees.[6]

**¶17** By contrast, as respects the surcharge at issue here, the relationship between the *business of renting vehicles* and the "*operation, or use of vehicles* on the public highways or streets" (emphasis added) is attenuated in at least two ways. First, the surcharge is not imposed on the road user (the driver-customer), but instead is imposed on the car-rental business, regardless of its own usage of vehicles on public highways or streets (and regardless of whether it chooses to pass along the surcharge to its customers). Second, the taxable event that triggers the surcharge is the *rental of a vehicle*, not its *operation or use*. While most every car-rental transaction will result in the customer using the car on public highways or streets, the surcharge is imposed regardless of whether, how much or how often the customer drives the car.

**¶18** Ohio appellate courts have issued three decisions addressing a nearly identical constitutional provision. *See generally State v. Curry*, 97 Ariz. 191, 194-95 (1965) (consulting decisions interpreting similar statutory

---

[6] According to information provided by *amicus* Arizona Department of Transportation, the revenue sources of the Arizona Highway Fund for each year since 2000 have been "Motor Vehicle Fuel Tax Revenues," "Motor Vehicle Registration Fee Revenues," "Motor Carrier Tax Revenues," "Motor Vehicle Operators' License Fees and Misc. Fees and Revenues," and "Motor Vehicle License (In Lieu) Tax Revenues." *See Sources of Revenues Deposited in the Arizona Highway User Revenue Fund and Arizona Highway Fund, Fiscal Year 2000 Through Fiscal Year 2016* (July 13, 2016), https://www.azdot.gov/docs/default-source/businesslibraries/hurf-annual-disclosure-file-2016.pdf?sfvrsn=10.

language in other states).[7]   In the first case, *Ohio Trucking Ass'n v. Charles*, 983 N.E.2d 1262 (Ohio 2012), the state supreme court considered whether its anti-diversion constitutional provision applied to fees assessed on certified abstracts of motor vehicle records.  The court rejected a strict plain-language approach to "relating to":

> At an extreme level, at the furthest stretch of its indeterminacy, there is no doubt that fees for certified abstracts are related to the registration of vehicles on public highways.  We are not convinced that this extreme view of "relating to" is logical; we know that it is not compelled by the language of [the constitutional provision] or the objectives of the amendment.

*Id.* at 1267, ¶ 15 (quotation omitted).  The court concluded that certified abstract fees were not sufficiently related to "registration, operation, or use" of vehicles because the abstract fees were "not *necessary* to the general motoring public" and "not *triggered by* the registration, operation, or use of a vehicle on the public highways."  *Id.* at 1267, ¶ 16 (emphasis added).

¶19        In another case decided a day later, the same court held that a business tax on gross receipts from the sale of motor-vehicle fuel fell within the scope of the constitutional provision.  *Beaver Excavating Co. v. Testa*, 983 N.E.2d 1317, 1319-20, ¶ 1 (Ohio 2012).  The tax at issue there, like the AzSTA surcharge, was a privilege tax paid by businesses, not a tax paid directly by motorists.  After considering the words "relating to" "according to [their] plain and ordinary meaning given in the context of political discussions and arguments, in order to carry out the intention and objectives of the people," *id.* at 1325, ¶ 30 (quotation omitted), the court concluded that the "text and history" of the provision showed it was intended to apply "broadly" to business privilege taxes "derived from the sales of motor-vehicle fuel" — not solely to transactional taxes imposed directly on fuel sales, *id.* at 1325-27, ¶¶ 30, 33-36.

¶20        Although *Beaver Excavating* supports Saban's position that the anti-diversion measure may encompass a business privilege tax, the case

---

[7]        The Ohio Constitution provides that "[n]o moneys derived from fees, excises, or license taxes relating to registration, operation, or use of vehicles on public highways, or to fuels used for propelling such vehicles, shall be expended for other than" highway and related purposes.  Ohio Const. art. XII, § 5a.

says little about the meaning of "relating to the registration, operation, or use of motor vehicles." The tax at issue there was imposed on fuel, which Ohio and Arizona's anti-diversion provisions both explicitly mention in a separate clause without any words of limitation. Further, whether framed as a business tax or a sales tax, a tax on motor-vehicle fuel directly relates to the operation or use of a motor vehicle.

¶21        The third Ohio case, *Fowler v. Ohio Dep't of Pub. Safety*, ___ N.E.3d ___, No. 16AP-867, 2017 WL 3263761 at *6, ¶ 21 (Ohio Ct. App. Aug. 1, 2017), considered a "financial responsibility reinstatement fee" imposed on motorists ticketed for driving without insurance. The court concluded the fee was not "related to" vehicle registration, operation or use because it was not required of all motorists as a prerequisite to driving, *see id.* at *5-*6, ¶¶ 18-19, and because it was not "trigger[ed]" by registration, operation or use of a vehicle but rather by a lack of insurance, *id.* at *6, ¶ 19. The court acknowledged an undeniable relationship between the fee and motor vehicle registration, but found that relationship was "too attenuated" to fall within the scope of the Ohio provision. *See id.*

¶22        Under the reasoning of these cases, an anti-diversion provision applying to fees or taxes "relating to . . . operation[] or use" of vehicles on public highways and streets only encompasses fees and taxes generally imposed on all who operate or use vehicles on public highways and streets, meaning fees or taxes that are a prerequisite to legally operating or using a vehicle on a public thoroughfare or that are triggered by operation or use of a vehicle on a public thoroughfare.[8]

¶23        These general principles are reflected in the categories of taxes the publicity pamphlet told Arizona voters would be subject to Section 14, and those that voters reasonably understood would not. All of the non-fuel revenue sources the pamphlet stated would be encompassed by the constitutional provision — "registration fees, unladen weight fees on

---

[8]        Other out-of-state cases the parties cite are less helpful because the anti-diversion provisions in those cases do not use the phrase "relate to" or "relating to." *See Thrifty Rent-A-Car Sys., Inc. v. City & County of Denver*, 833 P.2d 852, 856 (Colo. App. 1992) (provision applied to "proceeds from the imposition of any license, registration fee, or other charge with respect to the operation of any motor vehicle upon any public highway in this state") (alteration omitted); *Wittenberg v. Mutton*, 280 P.2d 359, 362 (Or. 1955) (provision applied to "proceeds from any tax or excise levied on the ownership, operation or use of motor vehicles").

common and contract motor carriers, and motor carrier taxes based on gross receipts" — are prerequisites to the legal operation or use of a vehicle on a public highway or are triggered by such operation or use of a vehicle. *See* ¶ 16 *supra*. The surcharge authorized by A.R.S. § 5-839 lacks any such nexus to operation or use of a vehicle. Setting aside the fact that the surcharge is imposed on car-rental businesses, not on car-rental customers, it goes without saying that one need not rent a vehicle to legally operate or use that vehicle on an Arizona street; moreover, the surcharge is not triggered by operation or use of a vehicle, but rather by a rental transaction. Consistent with that conclusion, as stated, we infer that when voters enacted Section 14 in 1952 knowing that Arizona already imposed a statewide car-rental tax, they understood that Section 14 would not constrain the state's use of the proceeds of that existing revenue source.[9]

**¶24**        Our analysis also is informed by the principle that "statutes must be given a sensible construction which will avoid absurd results." *Sherman v. City of Tempe*, 202 Ariz. 339, 343, ¶ 18 (2002) (citing *Sch. Dist. No. 3 of Maricopa County v. Dailey*, 106 Ariz. 124, 127 (1970)). Acknowledging that Section 14's reach is not limitless, Saban asserts we should construe the provision so that it "reach[es] no further than A.R.S. § 5-839." That contention disregards the duty of a court that is interpreting a legal provision to strive to discern and apply sound principles of general applicability in accordance with the intent of those who enacted the provision. Saban offers no principled rule of textual interpretation that would invalidate the surcharge here without invalidating many other vehicle-related taxes that Arizona never has earmarked for highway purposes — including taxes on motor vehicle sales and leases, auto repairs, sales of automobile-related equipment and parts, and everything else that might be said to be "related to" use of motor vehicles. Voters approved Section 14 more than 60 years ago. We cannot ignore that so far as we know,

---

[9]        Saban argues § 5-839(C) echoes the language of Section 14 in that it authorizes a surcharge on the business of renting "motor vehicles . . . that are designed to operate on the streets and highways of this state." Surely the lawmakers who enacted the statute did not intend the surcharge to fall within Section 14 – its purpose is to fund AzSTA facilities, not to benefit the Highway Fund. That being said, and accepting that the car-rental surcharge applies only to the renting of vehicles to be used on public thoroughfares, as stated above, the surcharge is imposed not on the *user* of those public thoroughfares but on the business that rents a vehicle to the user. Nor is it a tax that one must pay to legally operate a vehicle on a public thoroughfare or that is triggered by operation of a vehicle on a public thoroughfare.

at no time since then have they, the legislature or the executive branch seriously suggested that the provision might be or should be interpreted to sweep so broadly.

**¶25** In sum, contrary to Saban's contention, Section 14's text, context and history teach that the voters did not intend it to encompass every tax or fee in any way "relating to" vehicles. Instead, we conclude Section 14 applies to a tax or fee that is a prerequisite to, or triggered by, the legal operation or use of a vehicle on a public thoroughfare. By that reasoning, we hold it does not apply to the surcharge enacted pursuant to A.R.S. § 5-839.

## C. The Dormant Commerce Clause.

### 1. General principles.

**¶26** Saban cross-appeals the superior court's rejection of its challenge to the surcharge under the Dormant Commerce Clause implied by the United States Constitution. The Commerce Clause grants Congress the power to "regulate Commerce . . . among the several States." Art. I, § 8, cl. 3. "[T]he Commerce Clause . . . reflected a central concern of the Framers that[,] . . . in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Hughes v. Oklahoma*, 441 U.S. 322, 325 (1979). Accordingly, "[a]lthough the Clause is framed as a positive grant of power to Congress, [the U.S. Supreme Court has] 'consistently held this language to contain a further, negative command, known as the dormant Commerce Clause, prohibiting certain state taxation even when Congress has failed to legislate on the subject.'" *Comptroller of Treasury of Maryland v. Wynne*, ___ U.S. ___, ___, 135 S. Ct. 1787, 1794 (2015) (quoting *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995)). The concern of the Dormant Commerce Clause is with "economic protectionism[,] that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337-38 (2008) (quotation omitted). Here, Saban argues the surcharge violates the clause because it targets non-Arizona residents who rent vehicles when they visit the state.

**¶27** A threshold question under the Dormant Commerce Clause is whether the activity alleged to be unconstitutionally burdened is part of interstate commerce. Interstate commerce includes the provision of goods or services aimed primarily at out-of-state visitors. *See Heart of Atlanta*

*Motel, Inc. v. United State*s, 379 U.S. 241, 256 (1964) ("transportation of passengers in interstate commerce"); *Exec. Town & Country Servs., Inc. v. City of Atlanta*, 789 F.2d 1523, 1525-26 (11th Cir. 1986) (limousine business primarily used by airport patrons); *Op. of Justices to the House of Representatives*, 702 N.E.2d 8, 12 (Mass. 1998) (car-rental business). Saban submitted evidence on summary judgment that a significant majority of the customers of class members Avis, Hertz and Budget — 87%, 72.3% and 80%, respectively — are out-of-state residents. It does not matter, for purposes of the Dormant Commerce Clause, that the surcharge is not imposed directly on travelers from out of state, but rather is paid by businesses whose revenues derive from transactions with those travelers. *See Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 580 (1997) ("no analytic difference" when "the discriminatory burden is imposed on the out-of-state customer indirectly by means of a tax on the entity transacting business with the non-[resident] customer"); *Heart of Atlanta*, 379 U.S. at 258 ("[I]f it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze.") (citation omitted). Accordingly, the car-rental business in Arizona is part of interstate commerce.

**¶28** That being said, the Dormant Commerce Clause is not violated whenever a state taxes a service primarily used by non-residents. "It was not the purpose of the commerce clause to relieve those engaged in interstate commerce from their just share of state tax burden even though it increases the cost of doing . . . business." *Western Live Stock v. Bureau of Revenue*, 303 U.S. 250, 254 (1938). Thus, "interstate commerce may be made to pay its way." *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 281 (1977). A tax is not invalid if it "is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." *Id.* at 279.

**¶29** As framed on appeal, the only question under *Complete Auto* is whether A.R.S. § 5-839 impermissibly discriminates against interstate commerce. *See Complete Auto*, 430 U.S. at 279. In this context, "'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of State of Or.*, 511 U.S. 93, 99 (1994). In that inquiry, "a fundamental element . . . [is] the principle that 'any notion of discrimination assumes a comparison of substantially similar entities.'" *Davis*, 553 U.S. at 342-43 (quoting *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 342 (2007) (quoting *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298 (1997))). Thus, a law is

discriminatory if it "impose[s] disparate treatment on similarly situated in-state and out-of-state interests." *Tracy*, 519 U.S. at 298, n.12. Discriminatory laws are almost always *per se* invalid; they may survive a constitutional challenge only if they serve a legitimate local interest other than economic protectionism and there is no reasonable nondiscriminatory alternative. *See Dean Milk Co. v. City of Madison, Wis.*, 340 U.S. 349, 354 (1951).[10]

### 2. Facial discrimination.

¶30 Saban first argues the surcharge violates the Dormant Commerce Clause because it discriminates on its face against interstate commerce. "State laws discriminating against interstate commerce on their face are virtually *per se* invalid." *Camps Newfound*, 520 U.S. at 575 (quoting *Fulton Corp. v. Faulkner,* 516 U.S. 325, 331 (1996)) (internal quotation omitted). But there is no discrimination evident on the face of the surcharge or its statutory authority, A.R.S. § 5-802: The tax is imposed on all car-rental business revenues generated in Maricopa County, whether or not they are derived from transactions with customers who live in Arizona.

¶31 Saban argues, however, that the surcharge falls within what it calls a category of "facial discrimination-by-proxy" decisions by the Supreme Court that, according to Saban, "involve[] regulations that, while not drawn explicitly along state lines, contained language that either plainly was intended to serve as a neutral proxy for that demarcation or that impelled the Supreme Court to scrutinize the design or predictable effect of the tax scheme." But the two cases Saban cites both involve explicit facial discrimination. In the first, *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263 (1984), the Court struck down a Hawaii tax on liquor sales. The text of the statute plainly discriminated along state lines: It specifically exempted "[o]kolehao manufactured *in the State*" and "fruit wine manufactured *in the State* from products grown *in the State*." *Matter of Bacchus Imports, Ltd.*, 656 P.2d 724, 726, n.1 (Haw. 1982), *rev'd sub nom. Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263 (1984) (quoting Haw. Rev. Stat. § 244-4 (6), (7)) (emphasis added); *see also Bacchus Imports*, 468 U.S. at 265. In the second case, *Camps Newfound*, the Court struck down a Maine tax exemption that excluded

---

[10]     *Per se* discrimination is the only issue here. ADOR and AzSTA do not contend the surcharge can survive if it is *per se* discriminatory; Saban does not contend the surcharge is invalid under any lesser standard. *See Oregon Waste Sys.*, 511 U.S. at 99 ("nondiscriminatory regulations that have only incidental effects on interstate commerce are valid unless 'the burden imposed on such commerce is clearly excessive in relation to the putative local benefits'") (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

charitable institutions "conducted or operated principally for the benefit of persons who *are not residents of Maine*." 520 U.S. at 568 (emphasis added). Neither case supports Saban's argument for "facial discrimination-by-proxy."

### 3. Discriminatory effect.

**¶32** Even when no discrimination is evident on the face of a state provision, it may violate the Dormant Commerce Clause if its effects discriminate against non-residents. "The commerce clause forbids discrimination, whether forthright or ingenious. In each case it is our duty to determine whether the statute under attack, whatever its name may be, will in its practical operation work discrimination against interstate commerce." *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 201-02 (1994) (quoting *Best & Co. v. Maxwell*, 311 U.S. 454, 455-56 (1940)). Saban argues the surcharge is discriminatory because it falls disproportionately on out-of-state residents, who make up the majority of car-rental customers in Arizona.

**¶33** Because three-quarters or more of the customers of the plaintiff class are non-Arizona residents, it is undeniable that, to the extent class members pass along the surcharge to their customers, non-residents bear the main burden of the surcharge. The Supreme Court, however, has expressly rejected the notion "that a state tax must be considered discriminatory for purposes of the Commerce Clause if the tax burden is borne primarily by out-of-state consumers." *Commonwealth Edison Co. v. Mont.*, 453 U.S. 609, 618-19 (1981). The issue is whether non-residents bear a greater burden than *similarly situated* residents. *See CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 88 (1987); *see also, e.g.*, *Commonwealth Edison*, 453 U.S. at 617-18 (Montana coal tax imposed on all customers at same rate was permissible even though 90% of revenues were collected from non-resident customers); *Halliburton Oil Well Cementing Co. v. Reily*, 373 U.S. 64, 70 (1963) ("[E]qual treatment for in-state and out-of-state taxpayers similarly situated is the condition precedent for a valid use tax on goods imported from out-of-state."). Under this analysis, the surcharge does not discriminate in its effect on non-residents: It is imposed at the same rates on all car-rental revenues, whether those revenues are generated from transactions with residents or transactions with non-residents.[11]

---

[11] Saban contends the lower rate the surcharge imposes on revenues from temporary-replacement rentals (i.e., cars rented on a short-term basis

¶34        Saban argues the surcharge here is not unlike the tax struck down for its discriminatory effect in *W. Lynn Creamery*, 512 U.S. 186. But the tax at issue there -- a facially neutral tax imposed even-handedly on both in-state and out-of-state milk producers -- burdened out-of-state interests in a predictably disproportionate way because it was coupled with a subsidy that effectively refunded the tax to in-state milk producers, but not to out-of-state milk producers. *Id.* at 199, n.16. Here, no subsidy or other like measure reimburses an Arizona resident (or Arizona car-rental company) for the surcharge when a resident rents a car — a distinction that renders *W. Lynn Creamery* inapposite.

¶35        By Saban's reasoning, all taxes on goods and services used primarily by out-of-state residents would be suspect. But courts routinely uphold "tourism" taxes; as long as such taxes do not distinguish between in-state and out-of-state residents, it is irrelevant whether the overall burden of the tax falls mostly on visitors to the state. *See, e.g.*, *Youngblood v. State*, 388 S.E.2d 671, 672, 673 (Ga. 1990) (hotel tax used to help finance domed stadium; law "imposes an equal tax on residents of the state as well as nonresidents"); *Geja's Cafe v. Metro. Pier & Exposition Auth.*, 606 N.E.2d 1212, 1214, 1219-20 (Ill. 1992) (restaurant tax); *Second St. Properties, Inc. v. Fiscal Court of Jefferson County*, 445 S.W.2d 709, 711, 716 (Ky. 1969) (hotel tax to fund tourist and convention commissions); *Hunter v. Warren County Bd. of Supervisors*, 800 N.Y.S.2d 231, 233, 235 (App. Div. 2005) (tax on hotel room revenues); *Travelocity.com LP v. Wyo. Dep't of Revenue*, 329 P.3d 131, 151, ¶¶ 91-94 (Wyo. 2014) (same). By the same token, the lower rate charged on revenues from temporary-replacement rentals, which does not distinguish between residents and non-residents, is similar to residency-neutral exceptions in other tourism taxes that have been upheld. *See, e.g.*, *Paustian v. Pa. Convention Ctr. Auth.*, 3 Pa. D. & C.4th 16, 17, 20, 28-31 (Com. Pl. 1988), *aff'd sub nom. Paustian v. Pa. Convention Ctr. Auth.*, 561 A.2d 1337 (1989) (hotel tax exempted those renting a room for 30 days or more; "the classification is rational and those within the class are treated equally").

¶36        In the end, although the car-rental surcharge falls mostly on revenues generated by transactions with non-Arizonans, that is true only because non-Arizonans rent most of the cars. Saban has provided no evidence that the surcharge has an impermissible discriminatory effect.

---

to replace damaged or stolen cars) discriminates against non-residents, who are less likely to rent replacement vehicles and more likely to rent vehicles for vacations or other visits to Arizona.

### 4. Discriminatory purpose.

¶37        Saban also argues the surcharge is invalid because it purposefully discriminates against interstate commerce. Citing *Bacchus Imports*, Saban contends that a discriminatory purpose, by itself, may invalidate a law. *See* 468 U.S. at 270 ("Examination of the State's purpose in this case is sufficient to demonstrate the State's lack of entitlement to a more flexible approach permitting inquiry into the balance between local benefits and the burden on interstate commerce."). As further support, Saban cites *Amerada Hess Corp. v. Director, Div. of Taxation, N.J. Dep't of Treasury*, 490 U.S. 66, 75-76 (1989), in which the Court said of *Bacchus Imports* that "because the exemption [in that case] was motivated by an intent to confer a benefit upon local industry not granted to out-of-state industry, the exemption was invalid."

¶38        Notwithstanding the *dictum* in *Amerada Hess*, however, the tax invalidated in *Bacchus Imports* expressly discriminated on its face in favor of liquor produced in the state. *See* ¶ 31 *supra*. And Saban cites no case in which the Supreme Court has invalidated any measure on Dormant Commerce Clause grounds solely based on discriminatory intent. Nevertheless, some circuit courts of appeals have concluded that discriminatory purpose alone may be a sufficient ground on which to invalidate a measure under the Dormant Commerce Clause. *See, e.g., S.D. Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 594, 597 (8th Cir. 2003) (striking down voter-approved measure when "pro-con" statement sent to voters before the election was "brimming with protectionist rhetoric"); *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 337, 338, 340 (4th Cir. 2001) (bill's sponsor stated it addressed "large volume of out of state waste" coming into Virginia, and governor declared the state "has no intention of becoming the nation's dumping grounds"); *SDDS, Inc. v. S.D.*, 47 F.3d 263, 268, 272 (8th Cir. 1995) (ballot materials stated that "South Dakota is not the nation's dumping grounds"); *Alliance for Clean Coal v. Miller*, 44 F.3d 591, 595 (7th Cir. 1995) (statute's stated purpose was "the need to maintain and preserve as a valuable State resource the mining of coal in Illinois").

¶39        If discriminatory purpose may be enough by itself to invalidate a state tax under the Dormant Commerce Clause, the question is the nature and amount of the evidence required to prove such purpose, issues as to which the Supreme Court has not laid out clear guidance. *See*

*Hazeltine*, 340 F.3d at 596.[12]   In examining the evidentiary basis for the "purpose" of a measure challenged on equal-protection grounds, however, the Court has noted that: (1) it will assume that a law's *stated* purpose is its actual purpose; (2) the proper inquiry is into the law's "principal purposes"; and (3) it "will not invalidate a state statute . . . merely because some legislators sought to obtain votes for the measure on the basis of its beneficial side effects on state industry." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 463, n.7, 471, n.15 (1981) (law whose actual purpose is permissible is not invalid merely because some legislators defended it with protectionist rhetoric).

**¶40**          At issue in *Clover Leaf Creamery* was a state law that banned the sale of milk in certain plastic containers.   *Id.* at 458.   Although proponents argued the measure was aimed at promoting conservation, the challengers contended the real purpose of the law was to promote local "dairy and pulpwood industries," *id.* at 460, a contention supported by a statement by the law's chief legislative proponent chiding a colleague for letting "the guys in the alligator shoes from New York and Chicago come here and tell you how to run your business," Brief for Respondents, *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981), 1980 WL 339367 at *30 (cited in *Clover Leaf Creamery*, 449 U.S. at 463, n.7).   Another legislator supporting the bill said:

> I don't think there is anything the matter with supporting the timber industry which is our third largest employer in the state.  I think in fact that is one of our responsibilities to keep a healthy economy in the state rather than importing petrochemicals and importing plastic bottles from Chicago or wherever they are manufactured certainly the natural resources aren't from here.

*Id.* at 30-31.

---

[12]      "[T]he Supreme Court 'never has articulated clear criteria for deciding when proof of a discriminatory purpose and/or effect is sufficient for a state or local law to be discriminatory.  Indeed, the cases in this area seem quite inconsistent.'" *Puppies 'N Love v. Phoenix*, 116 F. Supp. 3d 971, 987 (D. Ariz. 2015) (quoting E. Chemerinsky, *Constitutional Law, Principles and Policies* 444-45 (4th ed. 2011)), *superseded by statute*, A.R.S. §§ 44-1799.10 to -1799.11 (2018), *as recognized and vacated by Puppies 'N Love v. Phoenix*, No. CV-14-00073-PHX-DGC, 2017 WL 4679258, at *6 (D. Ariz. Oct. 18, 2017).

¶41 The Supreme Court acknowledged these statements, but nonetheless refused to invalidate the law based on an improper protectionist purpose. The Court remarked that the lawmakers' protectionist statements were "easily understood, in context, as economic defense of an Act genuinely proposed for environmental reasons," *Clover Leaf Creamery,* 449 U.S. at 463, n.7, and concluded that "the principal purposes of the [law] were to promote conservation and ease solid waste disposal problems." *Id.*

¶42 As noted, the Arizona legislature enacted A.R.S. § 5-839 in 2000. According to the evidence offered on summary judgment and in the public record, the measure was proposed by a gubernatorial task force based on a report titled, "Arizona Tourism Retention and Promotion." According to the report, although the task force's original mission was to study how to pay for a new stadium to house the Arizona Cardinals and to maintain the Fiesta Bowl's "status as a 'Top-Tier' bowl," after considering "additional threats to the State's tourism tax base," the task force broadened its mission "to include the protection and promotion of Arizona's tourism industry and Cactus League[,] and directed that any capital finance plan to build a stadium also include resources to promote tourism retention." The report asserted that a new stadium would generate $800 million annually and that Arizona would not be allowed to host another Super Bowl without a new stadium. The report also stated that $200 million in annual revenues generated by the Cactus League were at risk because other warm-weather cities were offering new spring-training facilities to lure Major League Baseball teams away from Arizona. Pursuant to the Governor's reported directive "that the funding package minimize the impact on the average Arizona resident," the task force estimated that under the legislation it proposed, 85-90% of the car-rental and hotel assessments would be paid by visitors to Arizona.

¶43 At the sole legislative committee hearing on the bill that authorized AzSTA and its funding sources, members of the Governor's task force spoke on behalf of the measure, as did representatives of the Arizona Cardinals, the Fiesta Bowl and the Cactus League. The committee also heard words of support from the Arizona Office of Tourism, the Valley Hotel & Resort Association and from a representative of Enterprise Leasing, a car-rental company that has opted out of the present class action.

¶44 At the urging of a lawmaker who cited a desire to minimize the bill's "impact to residents," a House committee amended the proposed legislation to explicitly exempt vehicle rentals to Arizonans. *See* S.B. 1220, 44th Leg., 2d Reg. Sess., *Committee on Program Authorization Review*, Minutes

of Meeting (March 9, 2000) page E-11 (considering S.B. 1220). Other committee members opposed the exemption out of concern for its constitutionality; one warned that "certain nonresidents cannot be targeted." *Id.* at E-12. Ultimately, the resident exemption was stricken from the bill before it became law.

¶45 Notwithstanding Saban's arguments to the contrary, the statements recited above are even less probative of a discriminatory purpose than the comments at issue in *Clover Leaf Creamery*. The statements in that case were made in support of the challenged law; the comments by the Arizona lawmakers concerned an amendment — an exemption for Arizona residents — that the legislature ultimately rejected. We cannot conclude a statute that is neither discriminatory on its face nor in its effect is rendered unconstitutional simply because lawmakers considered and dismissed a protectionist amendment at some point in the legislative process. Nor is it proper to impute protectionist intent to legislators who correctly inform their peers of the constitutional limits to their power. *See also generally* Julian Cyril Zebot, *Awakening A Sleeping Dog: An Examination of the Confusion in Ascertaining Purposeful Discrimination Against Interstate Commerce*, 86 Minn. L. Rev. 1063, 1086 (2002) (invalidating statute based on purported discriminatory purpose when other legitimate purposes may exist "is a direct affront to state sovereignty, for it fails to respect legitimate state policymaking.").

¶46 Saban also cites as evidence of discriminatory intent a single sentence in the pamphlet sent to Maricopa County voters before the election on the surcharge. In the middle of the second page of the 22-page pamphlet, voters were told that "the surcharge on car rentals targets visitors to the State (and includes an exemption for 'replacement vehicles' for vehicles undergoing repair or similarly unavailable on a temporary basis)." We often look to election materials to discern the purpose of a voter-approved law. *See* ¶ 14 *supra*. But the language Saban cites is only one sentence in a lengthy document that broadly describes the purposes of the surcharge -- to promote tourism; to build a "multipurpose facility" for professional football, college bowl games and other events, including college basketball tournament games and trade shows and concerts; to build and renovate Cactus League facilities; and to develop youth and amateur sports and recreational facilities. Guided by the Supreme Court's demonstrated reluctance to strike down a law based on isolated statements evidencing protectionist motives, we are not persuaded that the statement Saban cites proves discriminatory intent sufficient to invalidate the surcharge.

¶47        In addition, Saban points to the Governor's task force report and comments by task force and AzSTA members to the effect that the surcharge was created so that visitors to Arizona would pay most of the cost of the new AzSTA-owned facilities.   Assuming for purposes of argument that these non-legislative statements may bear on the issue, they merely highlight that the facilities to be built with the surcharge were intended to spur tourism and its resulting positive effects on the Arizona economy.  As noted, proponents of AzSTA and the surcharge argued that the new facilities would attract visitors to the state, who would spend large amounts not only on rental cars but on hotels, food and beverage and other recreational activities.  Saban cites no authority for the notion that the Dormant Commerce Clause is offended by a tax on tourism activities when the proceeds of the tax are used to build facilities to attract tourists.[13] Because the car-rental surcharge funds construction of facilities that benefit non-residents who visit Arizona to attend events at those facilities, we are not persuaded that the comments Saban cites are anything other than legitimate discussion about whether services those non-residents purchase should be taxed to fund those facilities.

¶48        In sum, A.R.S. § 5-839 and the resulting car-rental surcharge are not discriminatory on their face; nor do they cause any discriminatory effects on interstate commerce.  Finally, assuming *arguendo* that a state tax that is non-discriminatory on its face and in its effect may be invalid solely based on a discriminatory purpose, Saban has not demonstrated that the challenged surcharge has a discriminatory purpose that violates the Dormant Commerce Clause.

## CONCLUSION

¶49        We conclude that the car-rental surcharge authorized under A.R.S. § 5-839 is not invalid under Article IX, Section 14 of the Arizona

---

[13]        Nor does Saban argue that the surcharge is unconstitutional because it is not fairly related to the promotion of tourism. *See Complete Auto*, 430 U.S. at 279.  Saban repeatedly asserts that the surcharge was designed to pay for a new stadium for the Arizona Cardinals, suggesting that the proceeds of the surcharge have been spent primarily for the benefit of local sports fans.  It offered no evidence, however, to support the proposition that (even apart from the multiplier effect of tourism dollars on the state's economy) the facilities built by the surcharge benefit local sports fans more than the out-of-state fans of professional and college football and Major League Baseball, concert-goers, trade-show visitors and others who use those facilities when they visit Arizona.

Constitution, and reverse the tax court's ruling on summary judgment to the contrary, including its award of attorney's fees and costs. We affirm the superior court's ruling that the surcharge is not unconstitutional under the Dormant Commerce Clause. Accordingly, we vacate the superior court's refund order, direct entry of judgment in favor of ADOR and AzSTA and remand for any further required proceedings consistent with this decision.



AMY M. WOOD • Clerk of the Court
FILED: AA