JUSTICE TIMMER, opinion of the Court:
 

 ¶1 Maricopa County imposes a surcharge on car rental agencies to fund a stadium and other sports and tourism-related ventures. The issue here is whether this surcharge violates the dormant Commerce Clause implied by Article I, Section 8, Clause 3 of the United States Constitution or the anti-diversion provision, article 9, section 14 of the Arizona Constitution. We hold that it does not violate either provision.
 

 BACKGROUND
 

 ¶2 The legislature created the Arizona Tourism and Sports Authority (the "AzSTA") in 2000 to build and operate a sports stadium, build Major League Baseball spring training facilities, build youth and amateur sports and recreation facilities, and promote tourism.
 
 See
 
 A.R.S. §§ 5-801(4), -802(A), -807 to -809, -815. AzSTA's authority is restricted to counties with populations greater than two million people, meaning it has only ever operated in Maricopa County.
 
 See
 
 § 5-802(A). AzSTA's construction projects are funded solely by taxes and surcharges approved by Maricopa County voters.
 
 See
 
 § 5-802(C). One such voter-approved surcharge is at issue here.
 

 ¶3 Soon after the creation of AzSTA, Maricopa County voters passed an initiative that levied a surcharge on car rental companies based on their income derived from leasing vehicles for less than one year.
 
 See
 
 A.R.S. § 5-839(A)-(C) (authorizing voters to levy the surcharge and providing its terms). (The initiative also imposed a tax on hotels. The hotel tax is not at issue here.) The surcharge is the greater of $2.50 per rental or 3.25% of the company's gross proceeds or gross income. § 5-839(B)(1). If the rental is a "temporary replacement" for a damaged or lost vehicle, however, the surcharge is a flat $2.50. § 5-839(B)(2). The state treasurer distributes $2.50 per rental transaction to the Maricopa County Stadium District, which has collected a surcharge in this amount since 1991.
 
 See
 
 § 5-839(G)(1) ; Act of June 25, 1991, ch. 285, § 10,
 
 1991 Ariz. Sess. Laws 1444
 
 , 1451-53 (1st Reg. Sess.) (codified at A.R.S. § 48-4234 ). The remaining amount, the difference between $2.50 per rental transaction and 3.25% of the company's gross income or proceeds, is distributed to AzSTA. § 5-839(G)(2). Although the surcharge is imposed on car rental companies, they can and do pass its cost on to their customers.
 

 ¶4 Plaintiff Saban Rent-a-Car ("Saban") rents vehicles in Maricopa County and has paid the car rental surcharge. Its customers are primarily local residents. In 2009, after unsuccessfully seeking a refund from the Arizona Department of Revenue ("ADOR"), Saban
 sued ADOR in the tax court and sought refunds and injunctive relief for all similarly situated car rental companies. The tax court certified a class of all individuals or entities that paid the surcharge from September 2005 through March 2008 and allowed AzSTA to intervene as a defendant.
 

 ¶5 As it does here, Saban argued to the tax court that the surcharge violates both the dormant Commerce Clause and the anti-diversion provision. On cross-motions for summary judgment, the court agreed with ADOR and AzSTA that the surcharge does not violate the dormant Commerce Clause. It agreed with Saban, however, that the surcharge violates the anti-diversion provision. Consequently, the court granted summary judgment for Saban and ordered ADOR to refund the surcharge payments to class members. The court also authorized ADOR to recoup the refund amounts from AzSTA pursuant to A.R.S. § 42-5029(G).
 

 ¶6 Like the tax court, the court of appeals ruled that the surcharge does not violate the dormant Commerce Clause.
 
 Saban Rent-A-Car LLC v. Ariz. Dep't of Revenue
 
 ,
 
 244 Ariz. 293
 
 , 296 ¶ 2,
 
 418 P.3d 1066
 
 , 1069 (App. 2018). But unlike the tax court, the court of appeals concluded that the surcharge also does not violate the anti-diversion provision.
 

 Id.
 

 It therefore reversed the tax court's ruling and remanded for entry of summary judgment in favor of ADOR and AzSTA.
 
 See
 

 id.
 

 at 308 ¶ 49,
 
 418 P.3d at 1081
 
 .
 

 ¶7 We granted review to address these legal issues of statewide importance. We have jurisdiction pursuant to article 6, section 5(3) of the Arizona Constitution.
 

 DISCUSSION
 

 I. The Dormant Commerce Clause
 

 ¶8 We review the constitutionality of the car rental surcharge de novo, as a question of law.
 
 See
 

 Gallardo v. State
 
 ,
 
 236 Ariz. 84
 
 , 87 ¶ 8,
 
 336 P.3d 717
 
 , 720 (2014). Likewise, "[w]e review questions of statutory construction and grants of summary judgment de novo."
 
 BSI Holdings, LLC v. Ariz. Dep't of Transp.
 
 ,
 
 244 Ariz. 17
 
 , 19 ¶ 9,
 
 417 P.3d 782
 
 , 784 (2018). We presume that a statute not involving fundamental constitutional rights or suspect-classification distinctions is constitutional "and will uphold it unless it clearly is not."
 
 Cave Creek Unified Sch. Dist. v. Ducey
 
 ,
 
 233 Ariz. 1
 
 , 5 ¶ 11,
 
 308 P.3d 1152
 
 , 1156 (2013).
 

 ¶9 The Commerce Clause empowers Congress "[t]o regulate Commerce ... among the several States." U.S. Const. art. I, § 8, cl. 3. By negative implication, states cannot unjustifiably discriminate against or erect barriers to interstate commerce.
 
 See
 

 Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of Or.
 
 ,
 
 511 U.S. 93
 
 , 98,
 
 114 S.Ct. 1345
 
 ,
 
 128 L.Ed.2d 13
 
 (1994). This implied restraint is known as the "dormant Commerce Clause" and serves to prevent "economic protectionism[,] that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors."
 
 Dep't of Revenue of Ky. v. Davis
 
 ,
 
 553 U.S. 328
 
 , 337-38,
 
 128 S.Ct. 1801
 
 ,
 
 170 L.Ed.2d 685
 
 (2008) ;
 
 see also
 

 Gen. Motors Corp. v. Tracy
 
 ,
 
 519 U.S. 278
 
 , 299,
 
 117 S.Ct. 811
 
 ,
 
 136 L.Ed.2d 761
 
 (1997) (describing the dormant Commerce Clause's fundamental objective as "preserving a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors"). The principles developed under the dormant Commerce Clause to counter economic Balkanization, however, have respected a degree of local autonomy, as favored by the Framers.
 
 See
 

 Davis
 
 ,
 
 553 U.S. at 338
 
 ,
 
 128 S.Ct. 1801
 
 ;
 
 see also
 

 Hunt v. Wash. State Apple Advert. Comm'n
 
 ,
 
 432 U.S. 333
 
 , 350,
 
 97 S.Ct. 2434
 
 ,
 
 53 L.Ed.2d 383
 
 (1977) (recognizing that "in the absence of conflicting legislation by Congress, there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it" (internal quotation marks omitted)).
 

 ¶10 To determine if a law violates the dormant Commerce Clause, courts initially ask whether the law "regulates evenhandedly with only incidental effects on interstate commerce, or discriminates against interstate commerce."
 
 Or. Waste Sys.
 
 ,
 
 511 U.S. at 99
 
 ,
 
 114 S.Ct. 1345
 
 (internal quotation marks
 omitted). If a law is discriminatory, it will survive only if its proponents "show that it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives."
 

 Id.
 

 at 100-01
 
 ,
 
 114 S.Ct. 1345
 
 (internal interlineations and quotation marks omitted). Courts have sometimes noted that such scrutiny renders a law "virtually
 
 per se
 
 invalid."
 
 See
 

 id.
 

 at 99
 
 ,
 
 114 S.Ct. 1345
 
 . If the challenged law is non-discriminatory but incidentally affects interstate commerce, a balancing test is used, and the law will be upheld unless "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."
 
 Pike v. Bruce Church, Inc.
 
 ,
 
 397 U.S. 137
 
 , 142,
 
 90 S.Ct. 844
 
 ,
 
 25 L.Ed.2d 174
 
 (1970).
 

 ¶11 Saban argues the car rental surcharge is discriminatory and thus subject to strict scrutiny review. A "discriminatory" tax is one that is "facially discriminatory, has a discriminatory intent, or has the effect of unduly burdening interstate commerce."
 
 Amerada Hess Corp. v. Dir., Div. of Taxation, N.J. Dep't of the Treasury
 
 ,
 
 490 U.S. 66
 
 , 75,
 
 109 S.Ct. 1617
 
 ,
 
 104 L.Ed.2d 58
 
 (1989). Saban abandons prior assertions that the surcharge is facially discriminatory and unduly burdens interstate commerce,
 
 see
 

 Saban
 
 , 244 Ariz. at 303 ¶ 30, 304 ¶ 32,
 
 418 P.3d at 1076-77
 
 , and solely argues the surcharge is "invalid because it was motivated by discriminatory intent, that is, forcing out-of-state visitors [to] pay a special tax that residents are shielded from." ADOR and AzSTA counter that the surcharge was not enacted with a discriminatory intent but, even if it was, intent alone is an insufficient reason to invalidate the surcharge.
 

 ¶12 The car rental surcharge was not enacted with a discriminatory intent, as that term is used in Commerce Clause jurisprudence. Discrimination "means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter."
 
 Or. Waste Sys.
 
 ,
 
 511 U.S. at 99
 
 ,
 
 114 S.Ct. 1345
 
 . Nothing in the language of the surcharge or in the publicity pamphlet for the initiative enacting the surcharge suggests an intent to treat in-state and out-of-state interests differently or engage in the type of "economic protectionism" at odds with the Commerce Clause. Indeed, the surcharge applies equally to resident and non-resident car rental agencies operating in Maricopa County and is calculated and imposed without regard to their customers' residencies.
 

 ¶13 Saban nevertheless argues that discriminatory intent exists because statements in the initiative's publicity pamphlet suggest voters targeted non-resident visitors, who purportedly rent most vehicles offered by car rental agencies, to pay the lion's share of the surcharges. But even if true, this does not evidence an intent that out-of-state visitors be
 
 treated
 
 any differently from residents, as required to be discriminatory.
 
 See
 
 id.
 

 The fact that visitors as a group pay most of the surcharges collected by car rental agencies is not "discriminatory."
 

 ¶14 The Supreme Court's decision in
 
 Commonwealth Edison Co. v. Montana
 
 ,
 
 453 U.S. 609
 
 ,
 
 101 S.Ct. 2946
 
 ,
 
 69 L.Ed.2d 884
 
 (1981), is illuminative. There, the Court concluded that Montana's tax on the sale of coal did not violate the dormant Commerce Clause even though most of the tax burden was borne by out-of-state consumers.
 

 Id.
 

 at 618, 636
 
 ,
 
 101 S.Ct. 2946
 
 . The Court expressed misgivings about judging the validity of a state tax on "its 'exportation' of the tax burden out of State," as the challengers there urged.
 

 Id.
 

 at 618
 
 ,
 
 101 S.Ct. 2946
 
 . It noted that for purposes of promoting free trade under the Commerce Clause, state borders are "essentially irrelevant" and reasoned that "invalidat[ing] the Montana tax solely because most of Montana's coal is shipped across the very state borders that ordinarily are to be considered irrelevant would require a significant and, in our view, unwarranted departure from the rationale of our prior discrimination cases."
 

 Id.
 

 at 618-19
 
 ,
 
 101 S.Ct. 2946
 
 . The Court also disagreed with the challengers' argument that out-of-state consumers should be protected from discriminatory tax treatment, pointing out "there is no real discrimination in this case; the tax burden is borne according to the amount of coal consumed and not according to any distinction between in-state and out-of-state consumers."
 

 Id.
 

 at 619
 
 ,
 
 101 S.Ct. 2946
 
 .
 

 ¶15 Although
 
 Commonwealth Edison
 
 addressed the purported discriminatory effect of Montana's coal tax, the Court's reasoning also reveals the meaning of "discriminatory intent" under the dormant Commerce Clause. Just as a tax that does not differentiate between interstate and intrastate commerce does not have a "discriminatory effect" when the tax burden is borne primarily by out-of-state consumers, those who enacted the tax intending that consequence did not do so with a "discriminatory intent."
 
 Cf.
 

 Bacchus Imports, Ltd. v. Dias
 
 ,
 
 468 U.S. 263
 
 , 270-71,
 
 104 S.Ct. 3049
 
 ,
 
 82 L.Ed.2d 200
 
 (1984) (stating that the Hawaii legislature acted with discriminatory intent by exempting only certain Hawaiian-made alcohol from alcohol tax to encourage and promote Hawaiian industry). Concluding otherwise would mean the validity of a tax would turn on serendipity: one state's tax that happens to be disproportionately paid by non-residents would be valid,
 
 see
 

 Commonwealth Edison
 
 ,
 
 453 U.S. at 618-19
 
 ,
 
 101 S.Ct. 2946
 
 , while the same tax in another state would be invalid only because its enactors intended that result. Because the surcharge here, like the Montana coal tax, is imposed even-handedly and does not distinguish between in-state and out-of-state car rental agencies or consumers, any intent by voters that out-of-state visitors ultimately pay most of the surcharge was not "discriminatory."
 

 ¶16 Saban argues that the car rental surcharge is like the Maine tax scheme that the Supreme Court invalidated under the dormant Commerce Clause in
 
 Camps Newfound/Owatonna, Inc. v. Town of Harrison
 
 ,
 
 520 U.S. 564
 
 ,
 
 117 S.Ct. 1590
 
 ,
 
 137 L.Ed.2d 852
 
 (1997). Maine provided a complete property and personal tax exemption for charitable organizations incorporated in the state but only if they did not operate principally for the benefit of non-residents.
 

 Id.
 

 at 568
 
 ,
 
 117 S.Ct. 1590
 
 . As a result, a church camp catering mostly to out-of-state campers was required to pay taxes while organizations operating camps attracting mostly Maine residents were exempt.
 

 Id.
 

 at 568-69
 
 ,
 
 117 S.Ct. 1590
 
 . The Court found the Maine tax scheme facially discriminatory because it expressly "singl[ed] out camps that serve mostly in-staters for beneficial tax treatment, and penaliz[ed] those camps that do a principally interstate business."
 

 Id.
 

 at 575-76
 
 ,
 
 117 S.Ct. 1590
 
 . It also analogized the discriminatory exemption to prohibited special fee assessments charged nonresidents for use of local services, noting "Maine's facially discriminatory tax scheme falls by design in a predictably disproportionate way" on non-residents and has the same "pernicious effect on interstate commerce."
 

 Id.
 

 at 578-80
 
 ,
 
 117 S.Ct. 1590
 
 ;
 
 see also
 

 id.
 

 at 579 n.13,
 
 117 S.Ct. 1590
 
 (stating "the [Maine] tax scheme functions by design and on its face to burden out-of-state users disproportionately").
 

 ¶17 We disagree with Saban that the car rental surcharge is tantamount to Maine's scheme to disproportionately burden non-residents who used services provided by in-state charitable organizations. The disproportionate burden in
 
 Camps Newfound/Owatonna
 
 referred to the costs placed only on non-residents for using in-state services.
 
 See
 

 id.
 

 at 578-79
 
 ,
 
 117 S.Ct. 1590
 
 (explaining that the discriminatory exemption is effectively no different from imposing a penalty on activity). It did not refer to the disparate impact on non-residents that stems solely from the fact that they consume more of the uniformly taxed good or service than in-state consumers.
 
 See
 

 id.
 

 at 580 n.13,
 
 117 S.Ct. 1590
 
 (distinguishing
 
 Commonwealth Edison
 
 because although non-residents bore most of the Montana coal tax burden by virtue of buying most of the coal, the tax was based on consumption and made no distinctions between resident and non-resident consumers). Like the tax in
 
 Commonwealth Edison
 
 , and unlike the exemption in
 
 Camps Newfound/Owatonna
 
 , the car rental surcharge is imposed uniformly on all car rental agencies, and ultimately on their customers, regardless of the agencies' or customers' residency status.
 

 ¶18 Saban also argues that voters acted with discriminatory intent by "exempting" temporary replacement vehicles "as a proxy for an overt exemption for the 'ordinary Arizona citizen.' "
 
 See
 
 § 5-839(B)(2). We disagree. First, temporary replacement vehicles are not exempted from the surcharge. Rather, the surcharge is calculated at $2.50 per vehicle rather than the greater of $2.50 per
 rental or 3.25% of the company's gross proceeds or gross income, as the surcharge is calculated for other rentals.
 
 See
 
 § 5-839(B)(1)-(2). Second, nothing suggests car rental agencies pass through more than $2.50 per rental to ordinary renters, thereby suggesting that those renting temporary replacement vehicles are treated more favorably. Indeed, according to its owner, Saban, like other car rental agencies, charges the same surcharge rate to all its customers. Third, the temporary replacement vehicle calculation applies whether the renter is a resident or a non-resident. And because numerous non-residents temporarily relocate to Arizona during the year, it is likely that many nonresidents rent temporary replacement vehicles.
 

 ¶19 In sum, the voters did not enact the car rental surcharge with a discriminatory intent because they did not intend to treat in-state and out-of-state economic interests differently. As a result, the surcharge does not trigger strict scrutiny review. Because Saban does not assert that the tax court or court of appeals misapplied the
 
 Pike
 
 balancing test, we do not address that issue. And considering our decision, we do not resolve the extent to which discriminatory intent alone can invalidate a tax under the dormant Commerce Clause. We note, however, that as Saban acknowledged at oral argument, a tax must burden interstate commerce in some way to be invalidated under that clause.
 
 Cf.
 

 Or. Waste Sys.
 
 ,
 
 511 U.S. at 98
 
 ,
 
 114 S.Ct. 1345
 
 (describing dormant Commerce Clause as addressing discrimination against or erection of barriers to interstate commerce).
 

 II. The Anti-Diversion Provision
 

 ¶20 The anti-diversion provision, article 9, section 14 of the Arizona Constitution, provides in relevant part as follows:
 

 No moneys derived from fees, excises, or license taxes relating to registration, operation, or use of vehicles on the public highways or streets or to fuels or any other energy source used for the propulsion of vehicles on the public highways or streets, shall be expended for other than highway and street purposes.
 

 The parties agree the car rental surcharge is an excise and is unrelated to vehicle registration. The only issue, therefore, is whether the surcharge "relat[es] to [the] ... operation[ ] or use of vehicles," which determines whether surcharge revenues must be used for road-related purposes. Resolution of this issue turns on the meaning of "relating to."
 

 ¶21 Our primary goal in interpreting the anti-diversion provision is to effectuate the electorate's intent in adopting it.
 
 See
 

 Jett v. City of Tucson
 
 ,
 
 180 Ariz. 115
 
 , 119,
 
 882 P.2d 426
 
 , 430 (1994). If we can discern the provision's meaning from its language alone, we will apply it without further analysis.
 
 See
 
 id.
 

 In doing so, however, we do not apply "[f]ine semantic or grammatical distinctions, legalistic doctrine [or] pars[e] ... sentences," as doing so "may lead us to results quite different from the objectives which the framers intended to accomplish."
 
 United States v. Superior Court
 
 ,
 
 144 Ariz. 265
 
 , 275-76,
 
 697 P.2d 658
 
 , 668-69 (1985). "Constitutions, meant to endure, must be interpreted with an eye to syntax, history, initial principle, and extension of fundamental purpose."
 

 Id.
 

 ;
 
 cf.
 

 Heath v. Kiger
 
 ,
 
 217 Ariz. 492
 
 , 495 ¶ 12,
 
 176 P.3d 690
 
 , 693 (2008) ("[C]ourts should avoid hypertechnical constructions that frustrate legislative intent." (quoting
 
 State v. Estrada
 
 ,
 
 201 Ariz. 247
 
 , 251 ¶ 19,
 
 34 P.3d 356
 
 , 360 (2001) ).
 

 ¶22 Saban argues that a fee, excise, or tax "relating to" the use or operation of vehicles plainly means one that is "connected to" driving vehicles on Arizona roads. And because the surcharge is passed through to car rental customers and "[c]ustomers rent cars to use them" on Arizona roads, Saban contends the surcharge falls within the anti-diversion provision. But Saban, somewhat anomalously, concedes that " 'related to' could have an almost unlimited reach if construed too broadly" and thus must be limited. We accept this concession. As the court of appeals explained, interpreting "relating to" as having any connection to the use or operation of vehicles on the pubic highways would encompass revenues that voters clearly did not intend to be covered, including those from "retail sales or business privilege taxes on car sales, tire sales, car leases and car repairs."
 

 See
 

 Saban
 
 , 244 Ariz. at 298 ¶ 10, 301 ¶ 23,
 
 418 P.3d at 1071, 1073
 
 . Because we cannot discern the meaning of "relating to" from the language of the anti-diversion provision alone, we consider its text in conjunction with the history and purpose of the provision.
 

 ¶23 The anti-diversion provision's origins are rooted in the early proliferation of automobiles in the United States, which sparked a need for a more extensive road network.
 
 See
 
 Chad D. Emerson,
 
 All Sprawled Out: How the Federal Regulatory System Has Driven Unsustainable Growth
 
 ,
 
 75 Tenn. L. Rev. 411
 
 , 437-38 (2008). Although state and local governments had traditionally borne the costs of building, improving, and maintaining roads, Congress passed the Federal Aid Road Act in 1916 to provide funding assistance.
 
 See
 

 id.
 

 at 432-33, 438
 
 . Even so, states, including Arizona, soon looked to new revenue sources, like gasoline taxes, to pay increasing costs rather than raising existing taxes.
 
 See
 

 id.
 

 at 438
 
 (stating, for example, that by the end of the 1920s, every state had adopted a gasoline tax);
 
 Texas Co. v. State
 
 ,
 
 31 Ariz. 485
 
 , 487,
 
 254 P. 1060
 
 (1927) (addressing Arizona's gasoline tax passed in 1921).
 

 ¶24 Congress passed the Hayden-Cartwright Amendment in 1934, which, in part, amended the Federal Aid Road Act by reducing federal aid to states that had imposed taxes on motor-vehicle transportation to fund roads before 1935 but thereafter diverted those tax revenues to non-road-related purposes.
 
 See
 
 Hayden-Cartwright Amendment of 1934, Pub. L. No. 73-393, § 12,
 
 48 Stat. 993
 
 , 995 (1934). Specifically, the Amendment provided:
 

 Since it is unfair and unjust to tax motor-vehicle transportation unless the proceeds of such taxation are applied to the construction, improvement, or maintenance of highways, after June 30, 1935, Federal aid for highway construction shall be extended only to those States that use at least the amounts now provided by law for such purposes in each State from State motor vehicle registration fees, licenses, gasoline taxes, and other special taxes on motor-vehicle owners and operators of all kinds for the construction, improvement, and maintenance of highways and administrative expenses in connection therewith....
 

 Id.
 

 Rather than risk reduced federal funding by failing to devote road-user tax revenues to road uses at less than 1934 levels, "all states have, by custom, statute or constitution, pledged highway user taxes to highway construction." Jerry L. Mashaw,
 
 The Legal Structure of Frustration: Alternative Strategies for Public Choice Concerning Federally Aided Highway Construction
 
 ,
 
 122 U. Pa. L. Rev. 1
 
 , 8 (1973).
 

 ¶25 Arizona reacted to the Hayden-Cartwright Amendment and ensured stable roadway funding by passing the "Better Roads Amendment" referendum in 1952, which added the anti-diversion provision to the state constitution. The publicity pamphlet mailed to all voters contained a "pro" argument from the Arizona Better Roads Committee's chair, who described the provision's purpose as "insur[ing] the expenditure of all revenues derived from road users to road uses only."
 
 See
 
 Ariz. Sec'y of State, 1952 Publicity Pamphlet 3 (1952), http://azmemory.azlibrary.gov/digital/collection/statepubs/id/10641 (hereinafter "Pamphlet");
 
 Ariz. Early Childhood Dev. & Health Bd. v. Brewer
 
 ,
 
 221 Ariz. 467
 
 , 471 ¶ 14,
 
 212 P.3d 805
 
 , 809 (2009) (stating publicity pamphlets can be examined to ascertain electorate's intent in passing a measure). He quoted the Hayden-Cartwright Amendment's rationale that diverting such tax revenues would be "unfair and unjust,"
 
 see
 

 supra
 
 ¶ 24, and noted the importance of not "jeopardiz[ing] federal aid by allowing any diversion of road user taxes to other than road purposes." Pamphlet,
 
 supra
 
 , at 4-5. (The Pamphlet did not contain other arguments.)
 

 ¶26 Saban argues that the text, purpose, and history of the anti-diversion provision demonstrate it applies to tax revenues "connected to" use or operation of vehicles on roads, as limited by an historically grounded "benefits theory of taxation." Specifically, the provision applies only to taxes and fees specially imposed on "those who impose wear and tear or otherwise benefit from using the roads."
 

 ¶27 ADOR and AzSTA argue that Saban's "benefits theory" limitation is illusory as it would give "relating to" an unlimited application
 that voters did not intend. They urge the court of appeals' narrower view that "relating to ... the ... use[ ] or operation of vehicles" refers to "a tax or fee that is a prerequisite to, or triggered by, the legal operation or use of a vehicle on a public thoroughfare."
 
 See
 

 Saban
 
 , 244 Ariz. at 302 ¶ 25,
 
 418 P.3d at 1075
 
 . We agree with the court of appeals' interpretation.
 

 ¶28 First, the provision's text supports a narrower interpretation of the disputed phrase than one meaning "connected to" or benefitting from road usage. The provision applies to two categories of taxes: (a) those "relating to" the "registration, operation, or use of vehicles," and (b) those imposed on fuels and other energy sources used to propel vehicles.
 
 See
 
 Ariz. Const. art. 9, § 14. Registration fees and fuel taxes are "connected to" the use or operation of vehicles. Owners register vehicles to use the roads. And fuel sellers indisputably benefit from their customers' use and operation of vehicles. The explicit mention of registration fees and fuel taxes therefore suggests that tax revenues "relating to ... the ... operation, or use of vehicles" encompass a more finite tax class than revenues derived from those with a "connection to" road usage or who benefit from it. Otherwise, as the court of appeals noted, the references to registration fees and fuel taxes would be superfluous.
 
 See
 

 Saban
 
 , 244 Ariz. at 298 ¶ 13,
 
 418 P.3d at
 
 1071 ;
 
 see also
 

 Fields v. Elected Officials' Ret. Plan
 
 ,
 
 234 Ariz. 214
 
 , 218 ¶ 16,
 
 320 P.3d 1160
 
 , 1164 (2014) (rejecting proposed interpretation of constitution that would render language meaningless). Interpreting "relating to" as the court of appeals did gives meaning to all terms.
 

 ¶29 We are unpersuaded by Saban's assertion that the legislature explicitly mentioned registration fees and fuel taxes in the Better Roads Amendment referendum simply to remove any doubt they were covered. We presume the legislature avoids redundancy in favor of concision and see no reason to conclude otherwise here.
 
 See
 

 City of Phx. v. Glenayre Elecs., Inc.
 
 ,
 
 242 Ariz. 139
 
 , 147 ¶ 32,
 
 393 P.3d 919
 
 , 927 (2017). We also disagree with Saban that the legislature demonstrated a penchant for redundancy by referring to revenues from both the "operation" and "use" of vehicles. They are different. The former refers to fees imposed on
 
 drivers
 
 while the latter refers to taxes and fees assessed on
 
 vehicles
 
 .
 
 See, e.g.
 
 , A.R.S. §§ 28-3002(A) (setting fees for driver licenses), -5471(A) (setting vehicle registration fees).
 

 ¶30 Second, the anti-diversion provision's history supports the court of appeals' interpretation. The Pamphlet identified non-fuel-related revenues dedicated to roads as "registration fees, unladen weight fees on common and contract motor carriers, and motor carrier taxes based on gross receipts" that are all "derived from road users."
 
 See
 
 Pamphlet,
 
 supra
 
 , at 3. All these taxes and fees are prerequisites for or triggered by the legal use of vehicles on our roads. None are imposed on businesses, like car rental agencies, that merely benefit from the existence of roads.
 

 ¶31 Notably, the Pamphlet also stated that adopting the referendum would maintain the status quo as Arizona was then using all road-user taxes for road uses. Pamphlet,
 
 supra
 
 , at 5 ("Arizona is in a particularly favorable position to adopt [the anti-diversion provision] this year, because it is not now diverting its road user taxes ... [and passage] will entail no change in the source or expenditure of highway revenues."). Yet Arizona had imposed transaction privilege taxes on car rental agencies since 1935 and used those revenues for general purposes.
 
 See
 

 Saban
 
 , 244 Ariz. at 299 ¶ 15,
 
 418 P.3d at 1072
 
 (relating history of transaction privilege tax on car rental agencies). This history suggests that neither the referendum drafter (the legislature) nor voters considered existing taxes on car rental agencies to be "road user taxes" or intended to include such taxes within the provision's ambit.
 

 ¶32 Saban agrees that 1952 voters did not intend that the anti-diversion provision apply to transaction privilege taxes on car rental agencies. It nevertheless argues that the car rental surcharge is distinguishable, likening it to the license tax Arizona imposed on common and contract motor carriers of property and passengers in 1952, which the Pamphlet described as a road-user tax that would
 be subject to the provision.
 
 See
 
 Act of Mar. 18, 1933, ch. 100, §§ 2, 17, 1933 Sess. Laws 472, 473-74, 481-82 (codified at Ariz. Ann. Code §§ 66-502, -518 (1939)); Pamphlet,
 
 supra
 
 , at 3, 5. Specifically, Saban asserts that, like the motor carrier license tax, the surcharge is a "special tax" not imposed generally on all businesses but aimed at "motor vehicle owners and operators of all kinds" who benefit from using Arizona roads. According to Saban, and echoing the Hayden-Cartwright Amendment's vernacular, it would be "unfair and unjust" to impose the surcharge on car rental drivers but divert those revenues from road-related purposes.
 

 ¶33 We disagree that the car rental surcharge is more like the motor carrier license tax imposed in 1952 than the 1935 transaction privilege tax imposed on car rental agencies. Payment of the motor carrier license tax was required to legally use vehicles on our roads.
 
 See
 
 §§ 2, 17, 1933 Sess. Laws at 473-74, 481-82. In contrast, the surcharge, like the transaction privilege tax, is imposed on the business of renting vehicles and is not required to be paid before a rental vehicle can be legally operated on roads. Instead, car rental agencies pay licensing fees, like everyone else, to authorize a vehicle's road usage whether the operator is an employee or a customer.
 
 See
 
 A.R.S. §§ 28-2153(A), -2157 (requiring vehicle registration and payment of registration fees). And car rental drivers pay licensing fees to their home states/countries as a condition for driving on Arizona roads.
 
 See
 
 A.R.S. §§ 28-3151, -3158(B) (requiring driver's license and payment of fee). Additionally, the surcharge is no more aimed at car rental customers than was the 1935 transaction privilege tax. Like the surcharge, the transaction privilege tax could be passed on to car rental customers, yet the tax was not considered a road-user tax and did not fall within the provision.
 

 ¶34 That the surcharge is a "special tax" not levied generally on all businesses also fails to distinguish it from the 1935 transaction privilege tax. When enacted, that tax applied to a limited number of businesses.
 
 See
 

 White v. Moore
 
 ,
 
 46 Ariz. 48
 
 , 54-55,
 
 46 P.2d 1077
 
 (1935) (describing 1935 transaction privilege tax and noting "the Legislature thought best not to impose it on ... all lines of endeavor but only on ... certain occupations and businesses"),
 
 superseded by statute as stated in
 

 Peterson v. Smith
 
 ,
 
 92 Ariz. 340
 
 , 342,
 
 376 P.2d 865
 
 (1962). Car rental agencies fell within a class of public entertainment and tourist-related businesses, which were taxed at the highest rate.
 
 See
 

 id.
 
 at 55-56,
 
 46 P.2d 1077
 
 . Regardless of this "special" treatment, the legislature and voters in 1952 did not consider the tax a road-user tax. Similarly, the anti-diversion provision does not apply to the surcharge, which is part of a taxing plan that imposes a special tax on hotels, simply because it applies only to car rental agencies.
 

 ¶35 The court of appeals' interpretation also aligns with the Hayden-Cartwright Amendment, which at least partially drove the Better Roads Amendment. The Hayden-Cartwright Amendment conditioned full federal aid on a state continuing to direct revenues from road-user taxes and fees to road uses.
 
 See
 

 supra
 
 ¶ 24. As explained, revenues from the 1935 transaction privilege tax on car rental agencies were never dedicated solely for road purposes. Likewise, directing surcharge revenues, which also derive from taxes imposed on the business of renting vehicles, to non-road purposes does not offend the Hayden-Cartwright Amendment.
 

 ¶36 Finally, we agree with ADOR and AzSTA that Saban's "benefits theory" provides no limitation to the term "relating to." If the anti-diversion provision applies to the surcharge, no principled reason exists not to apply it to fees and taxes levied against car sale dealers, automotive repair shops, and the like.
 

 ¶37 Justice Bolick's partial dissent accuses us of embarking on a "circuitous journey" that "rewrite[s] constitutional text" to "create[ ] a loophole" for publicly financed sports stadiums.
 
 See
 

 infra
 
 ¶¶ 41-42, 59. Strong words. But they are not backed by rejoinders to our analysis rejecting Saban's "special tax" argument,
 
 see
 

 supra
 
 ¶¶ 31-35, despite the fact the dissent adopts Saban's view.
 
 See
 

 infra
 
 ¶¶ 49-51 (stating that "a tax is 'relating to' if it is specially directed at the operation or use of vehicles on public highways," and concluding that a surcharge imposed on car rental agencies is such a tax).
 

 ¶38 The dissent's effort to ascertain the voters' intent in enacting the anti-diversion provision by parsing language from the Hayden-Cartwright Amendment is unpersuasive.
 
 See
 

 infra
 
 ¶¶ 45-49. Neither the provision nor the Pamphlet recited (or even mentioned) the language seized on by the dissent, meaning that language almost certainly had no bearing on voters' intent. Also, the provision was not enacted to comply with the Hayden-Cartwright Amendment and obtain federal funding.
 
 See
 

 infra
 
 ¶ 49 ("Arizona voters implemented the Hayden-Cartwright Amendment through the anti-diversion clause."). Arizona had already been receiving federal funding for roads at the time the provision was adopted in 1952.
 
 See
 
 Pamphlet,
 
 supra
 
 , at 5. Necessarily, therefore, the state had already complied with the Hayden-Cartwright Amendment by devoting road-user taxes-which did not include the "special" transaction privilege tax placed on car rental agencies-to road uses. Proponents of the provision were driven by the desire to ensure that Arizona continued to devote these tax revenues to road uses.
 
 See
 
 Pamphlet,
 
 supra
 
 , at 5 ("Public policy in Arizona has consistently opposed diversion [of road user taxes to non-road purposes], although there have been constant threats to highway funds in bills introduced from time to time in the legislature.").
 

 ¶39 In sum, "fees, excises, or license taxes relating to ... the ... operation, or use of vehicles" are ones imposed as a prerequisite to, or triggered by, the legal operation or use of a vehicle on a public road. The surcharge falls outside this definition and therefore does not violate the anti-diversion provision.
 

 CONCLUSION
 

 ¶40 For the foregoing reasons, we affirm the court of appeals' opinion. We reverse the tax court's judgment in favor of Saban and remand with directions to enter judgment in favor of ADOR and AzSTA and for any further required proceedings consistent with our opinion. Finally, we vacate the tax court's refund order.