IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

---

**STATE OF ARIZONA, EX REL. MARK BRNOVICH, ATTORNEY GENERAL,**
*Petitioner,*

*v.*

**CITY OF PHOENIX,**
*Respondent.*

---

No. CV-20-0019-SA
Filed August 3, 2020

---

**SPECIAL ACTION**
**JURISDICTION ACCEPTED; RELIEF DENIED**
**DECLARING STATUTORY BOND PROVISION UNENFORCEABLE**

COUNSEL:

Mark Brnovich, Arizona Attorney General, O. H. Skinner, Solicitor General, Brunn W. Roysden III, Linley Wilson, Keena Patel, Assistant Attorneys General, Phoenix, Attorneys for State of Arizona

Jean-Jacques Cabou, Alexis E. Danneman, Matthew R. Koerner, Margo R. Casselman, Perkins Coie LLP, Phoenix, Attorneys for City of Phoenix

Mary R. O'Grady, Joseph N. Roth, Osborn Maledon, P.A., Phoenix, Attorneys for Amicus Curiae League of Arizona Cities and Towns

Patrick Irvine, Fennemore Craig, P.C., Phoenix, Attorneys for Amicus Curiae Arizona Association of Realtors

Grady Gammage Jr., Cameron C. Artigue, Gammage & Burnham, P.L.C., Phoenix; Daniel Reimer, Daniel S. Reimer LLC, Denver, CO, Attorneys for Amici Curiae Airports Council International-North America, American

Association of Airport Executives, Airlines for America

Erin Adele Scharff, Phoenix, Attorney for Amici Curiae Law Professors

Timothy Sandefur, Matthew R. Miller, Scharf-Norton Center for Constitutional Litigation at the Goldwater Institute, Phoenix, Attorneys for Amicus Curiae Ride-Sharing Drivers and Passengers

W. Eric Pilsk, Kaplan Kirsch & Rockwell LLP, Washington, D.C.; Susan M. Freeman, Lewis Roca Rothgerber Christie LLP, Phoenix, Attorneys for Amicus Curiae Phoenix-Mesa Gateway Airport Authority, The Arizona Airports Association

Ian Heath Gershengorn, Devi M. Rao, Noah B. Bokat-Lindell, Jenner & Block LLP, Washington, D.C.; Mark Ogden, Littler Mendelson, Phoenix; Joshua Wilkenfeld, Uber Technologies, Inc., Washington, D.C., Attorneys for Amicus Curiae Rasier, LLC

Mark S. Kokanovich, Daniel A. Arellano, Ian O. Bucon, Ballard Spahr LLP, Phoenix, Attorneys for Amici Curiae Cities of Mesa, Scottsdale, Tempe, Flagstaff, and Sedona

Andrew J. McGuire, Trish Stuhan, Samantha Winter McAlpin, Gust Rosenfeld P.L.C., Phoenix, Attorneys for Amicus Curiae Tucson Airport Authority, Inc.

John "Jack" D. Wilenchik, Joshua C. Offentartz, Wilenchik & Bartness, P.C., Phoenix, Attorneys for Amicus Curiae Phoenix City Councilman Sal Diccicio

———————————

VICE CHIEF JUSTICE TIMMER authored the Opinion of the Court, in which CHIEF JUSTICE BRUTINEL, JUSTICES BOLICK, GOULD, LOPEZ, BEENE, and MONTGOMERY joined.

———————————

VICE CHIEF JUSTICE TIMMER, Opinion of the Court:

**¶1**        Article 9, section 25 of the Arizona Constitution prohibits the state and local governments from imposing or increasing taxes or other "transaction-based" fees on services. We are asked here to decide whether this prohibition extends to "trip fees" imposed by the City of Phoenix ("City") on commercial ground transportation providers who transport passengers to and from Phoenix Sky Harbor International Airport ("Airport"). We hold that because these fees are not "transaction-based," they are not constitutionally prohibited.

**¶2**        This is a special action filed pursuant to A.R.S. § 41-194.01(B)(2), which provides that this Court must require the local government whose law is challenged to file a substantial bond. We declare this bond provision unenforceable.

## BACKGROUND

**¶3**        Cities in Arizona are empowered by the Arizona Constitution to engage in business to the same extent as private parties. *See* Ariz. Const. art. 13, § 5. Exercising that authority, and as permitted by state law, the City owns and operates the Airport. *See* A.R.S. § 28-8411(A) (authorizing cities to own and operate airports).

**¶4**        The City authorizes third-party commercial use of Airport property by lease, permit, or license agreement. *See* Phx., Ariz., Code ch. 4, art. 1, § 4-4; *see also* A.R.S. § 28-8419(B) (authorizing cities to "establish fees and charges" for use of airport facilities). All monies paid to the City for commercial activity must be used exclusively to maintain or operate the Airport. *See* 49 U.S.C. § 47107(a)(13)(A), (k)(3), (requiring revenue reinvestment to make an airport "as self-sustaining as possible" as a condition for receiving federal funding); *id.* § 47133(a) (restricting expenditure of "revenues generated by an airport that is the subject of Federal assistance" to "capital or operating costs" related to the airport); *see also id.* § 40116(d)(2)(A)(iv) (requiring all taxes, fees, and charges on businesses operating as permittees at an airport be "wholly utilized for airport or aeronautical purposes"). According to the City, more than one thousand businesses pay fees to use the Airport.

**¶5**        Commercial ground transportation providers operating at the Airport must obtain authorization permits from the City's aviation director. *See* Phx., Ariz., Code ch. 4, art. 4 § 4-68(A). "Transportation network

companies" ("TNCs") are a type of commercial ground transportation provider. TNCs, such as Uber and Lyft, use "a digital network or software application" that permits passengers to arrange rides with TNC drivers. *See id.* § 4-67 (defining "transportation network company"). The City maintains that TNCs started operating at the Airport in 2016, quickly expanded, and now provide more than two-thirds of all ground transportation passenger pick-ups at the Airport.

¶6　　　　In 2016, the Phoenix City Council amended the Phoenix City Code to require most commercial ground transportation providers, including TNCs, to pay a "trip fee" each time a driver picked up one or more passengers from the Airport. *See id.* § 4-78 (rev. 2016). The trip fee varied from $2.25 to $9.00, depending on when the provider was authorized to operate at the Airport and the vehicle's passenger capacity, and it automatically increased annually through January 1, 2019. *See id.* The Council simultaneously directed the City's aviation department to complete a study of trip fees imposed at comparable airports by January 1, 2020. For ease of reference, we collectively refer to TNCs and non-TNCs subject to trip fees, like taxis and limousines, as "providers."

¶7　　　　In 2018, Arizona voters passed Proposition 126, "The Protect Arizona Taxpayers Act" initiative, amending the Arizona Constitution to prohibit the state, cities, and other political subdivisions from imposing new taxes on services. Ariz. Const. art. 9, § 25 ("Section 25"). Proposition 126 also amended other constitutional provisions to remove any conflicts with Section 25. *See id.* art. 13, § 2 (providing that a city charter cannot grant authority that violates Section 25); *id.* art 9, § 6 (vesting cities with power to impose special assessments or special taxes to make improvements "[e]xcept as provided by section 25"). The proposition's stated purpose was to prevent governmental entities from following other states' leads and "taxing these vital everyday services," ranging from medical treatments and child care to haircuts "and much more," thereby increasing expenses for these services for both consumers and small businesses. *See* The Protect Arizona Taxpayers Act, Proposition 126, § 2 (2018).

¶8　　　　Section 25's prohibition applies only to taxes, fees, and other assessments imposed on or after January 1, 2018. *See* Ariz. Const. art. 9, § 25. Because the City's imposition of a pick-up trip fee with annual increases was in place before that date, Section 25 does not affect that fee, at least as to the fee schedule established in 2016.

¶9 In December 2019, the City Council adopted Ordinance G-6650 ("Ordinance"), which is the subject of the dispute before us. The Ordinance revised several Phoenix City Code provisions addressing commercial ground transportation at the Airport. Pertinent here, the Ordinance adjusted passenger pick-up fees and imposed new trip fees for dropping off departing passengers at the Airport. *See* Phx., Ariz., Code § 4-78. Adoption of the Ordinance followed the aviation department's study, which concluded that comparable airports consistently collected more revenue from ground transportation providers than the City. *See* Phx., Ariz., City Council Report, Item No. 42, at 1 (Agenda Date: 12/18/2019). The new fees were reportedly intended to recoup the City's costs for the providers' "proportionate share of existing and future ground-transportation infrastructure, improvements, and operation/maintenance of this infrastructure, including maintenance of the PHX Sky Train, and to comply with federal law requiring [the Airport] to achieve and maintain economic self-sufficiency." *Id.*

¶10 The new fee structure imposed by the Ordinance, which was scheduled to commence on February 1, 2020, treats TNCs differently from non-TNCs. The pick-up and drop-off trip fees for TNCs now start at $4.00, increase annually to $5.00 by 2024, and automatically increase each subsequent year by at least 3%. Phx., Ariz., Code § 4-78(A)(1). The trip fees for non-TNCs decrease initially, ranging from $1.75 to $5.00, depending on passenger capacity, until 2021, when they automatically increase each subsequent year by at least 3%. *Id.* § 4-78(A)(2). Trip fees for both TNCs and non-TNCs are discounted when drivers use alternative-fuel-powered or zero-emission vehicles or pick-up/drop-off passengers at PHX Sky Train stations located away from terminals. *Id.* § 4-78(A)(6).

¶11 Trip fees apply one of two ways, depending on the trip-tracking technology used by providers at the Airport. *See id.* § 4-72 (requiring such technology). Providers using GPS technology track trips themselves and report the number of trips monthly. *See id.* 4-78(A)(5). Trip fees apply each time a driver enters a "geofence," makes one or more stops, and picks up or drops off a passenger. *Id.* § 4-78(A)(3); *see also id.* § 4-67 (defining a "geofence" as marking "an electronic perimeter" or "sub-perimeter" on Airport property). If the GPS system fails, the City assesses fees based on historical usage. *See* § 4-78(A)(4). The City invoices providers monthly for outstanding trip fees. *See id.* § 4-78(A)(7).

¶12         Providers using the Airport's system of radio frequency readers, which identify and track a vehicle's physical location in the Airport by "reading" an affixed tag, are tracked automatically. *See id.* §§ 4-67, 4-78(A)(3). Fees apply each time a driver enters or exits the Airport and stops at one or more sites dedicated to picking up or dropping off passengers. *Id.* § 4-78(A)(3), (5). If providers use designated pick-up or drop-off locations without radio frequency readers, they must report trips to the City. *Id.* § 4-78(A)(5). The City also invoices these providers monthly for outstanding trip fees. *See id.* § 4-78(A)(7).

¶13         The Ordinance dedicates specified linear feet of Airport terminal curb space to TNCs for picking up and dropping off passengers. TNCs were given 30% of available curb space starting January 1, 2020, which annually increases to 50% in 2022. *Id.* § 4-78(A)(10). Thereafter, curb sharing adjusts proportionally with TNCs' usage. *Id.* The City's aviation department also dedicates curb space for non-TNC pick-ups and drop-offs. *See* City of Phoenix Aviation Dep't, No. 8-01, Rules & Regulations, at 12–12.2, Exhibits A, C–E (2016).

¶14         Before the Ordinance took effect, an Arizona legislator asked the Attorney General to investigate whether it violates Section 25. The request triggered § 41-194.01(A), which requires the Attorney General, "[a]t the request of one or more members of the legislature," to "investigate any ordinance, regulation, order or other official action adopted or taken by the governing body of a county, city or town that the member alleges violates state law or the Constitution of Arizona." Within thirty days, the Attorney General must make a written report finding either that the challenged action violates, may violate, or does not violate state law or the Arizona Constitution. § 41-194.01(B). Consequences flow from each finding. *Id.*

¶15         The Attorney General found that the Ordinance may violate Section 25. Thus, he filed a special action asking this Court to resolve the issue. *See* § 41-194.01(B)(2) (providing that upon a finding that a challenged action "may violate" state law or the constitution, "the attorney general shall file a special action in [the] supreme court to resolve the issue"). Pursuant to the parties' stipulation, we stayed enforcement of the Ordinance pending a decision.

¶16         We have jurisdiction pursuant to article 6, section 5(6) of the Arizona Constitution and § 41-194.01(B)(2). After considering briefs filed by the parties and amici, this Court previously issued an order holding the Ordinance constitutional. We therefore denied relief and lifted the stay,

stating that an Opinion explaining our reasoning would follow. This is that Opinion.

## DISCUSSION

### I. Does the Ordinance violate Section 25?

¶17  We review the constitutionality of the Ordinance de novo as an issue of law. *See Saban Rent-a-Car LLC v. Ariz. Dep't of Revenue*, 246 Ariz. 89, 92 ¶ 8 (2019). Because the challenge does not involve fundamental constitutional rights or suspect-classification distinctions, we presume the Ordinance complies with Section 25 "unless it clearly [does] not." *Id.* (quoting *Cave Creek Unified Sch. Dist. v. Ducey*, 233 Ariz. 1, 5 ¶ 11 (2013)).

¶18  Section 25 provides, in relevant part, as follows:

> [1] The state, any county, city, town, municipal corporation, or other political subdivision of the state, or any district created by law with authority to impose any tax, fee, stamp requirement, or other assessment, shall not [2] impose or increase [3] any sales tax, transaction privilege tax, luxury tax, excise tax, use tax, or any other transaction-based tax, fee, stamp requirement or assessment [4] on the privilege to engage in, or the gross receipts of sales or gross income derived from, [5] any service performed in this state.

No language makes these elements disjunctive. Therefore, Section 25 is violated only if all five identified elements exist.

¶19  The parties agree that if the Ordinance violates Section 25 it does so by imposing or increasing a "transaction-based . . . fee" on the privilege of engaging in a service. Deciding whether the trip fees imposed by the Ordinance are "transaction-based," as that term is used in Section 25, depends on the meaning of "transaction," which our constitution does not define. The Attorney General argues "transaction" means "any activity involving two or more persons." He asserts that entering and exiting the Airport is "any activity" engaged in by two or more persons (drivers and

passengers), making the trip fees based on entry and exit "transaction-based."

**¶20**        The City counters that, read in context, "transaction" refers to "a commercial agreement or an exchange of consideration." By contrast, because trip fees are not based on the fare paid by passengers to providers, and they apply whether or not a fare is paid, the City argues those fees are not "transaction-based." The City instead characterizes the trip fees as "user fees" for Airport property, which are not encompassed by Section 25.

**¶21**        In interpreting Section 25, our primary goal is to effectuate the electorate's intent in adopting it. *See Saban Rent-a-Car LLC*, 246 Ariz. at 95 ¶ 21. To determine that intent, we give the words their ordinary meaning, unless the context suggests a different one. *See Am. Fed'n of State Cty. & Mun. Emps. AFL-CIO Local 2384 v. City of Phoenix.* (*AFL-CIO Local 2384*), ___ Ariz. ___, ___ ¶ 13 (2020). We will not apply "fine semantic or grammatical distinctions" or "parse sentences," however, as doing so "may lead us to results quite different from the objectives which the framers intended to accomplish." *See Saban Rent-a-Car LLC*, 246 Ariz. at 95 ¶ 21 (quoting *United States v. Superior Court*, 144 Ariz. 265, 275–76 (1985)). If the provision has only one reasonable interpretation, we apply it. *See AFL-CIO Local 2384*, ___ Ariz. at ___ ¶ 13. But if more than one reasonable interpretation exists, we will examine secondary principles to identify the correct interpretation. *See id.*

**¶22**        As the parties note, "transaction," in isolation, has alternate meanings. It may refer to "an exchange or transfer or goods, services, or funds," or "a communicative action or activity involving two parties or things that reciprocally affect or influence each other." *Transaction*, Merriam-Webster, https://www.merriam-webster.com/dictionary/transaction (last visited July 28, 2020); *see also Transaction,* Black's Law Dictionary (10th ed. 2014) (defining the term variously as "[t]he act or an instance of conducting business or other dealings," "the formation, performance, or discharge of a contract," or "[a]ny activity involving two or more persons").

**¶23**        The context in which "transaction-based" is used in Section 25 reveals the meaning intended by voters. "Transaction-based" appears in Section 25's "catch-all" provision after a list of enumerated taxes. *See* Ariz. Const. art. 9, § 25 (prohibiting imposing or increasing specific categories of taxes and extending that prohibition to "*any other* transaction-

based tax, fee, stamp requirement or assessment" (emphasis added)). Under the *ejusdem generis* canon, the term "transaction-based" should be interpreted as referring to the same type of taxes as those specifically enumerated. *See City of Phoenix v. Glenayre Elecs., Inc.*, 242 Ariz. 139, 146–47 ¶ 30 (2017) ("*[E]jusdem generis* applies 'where general words follow the *enumeration* of particular classes of things.'" (quoting *Bilke v. State*, 206 Ariz. 462, 465 ¶ 13 (2003))); *see also Williams v. Pipe Trades Indus. Program of Ariz.*, 100 Ariz. 14, 20 (1966) (applying *ejusdem generis* canon to a constitutional provision and concluding that "[t]he phrase 'other public purposes' must, accordingly, have been intended to restrict the purpose in some manner similar to those enumerated"). Application of the closely related canon *noscitur a sociis*, which "holds that words grouped in a list should be given related meanings," leads to the same result. *See Normandin v. Encanto Adventures, LLC*, 246 Ariz. 458, 460–61 ¶¶ 11–12 (2019) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 195–96 (2012)) (applying *noscitur a sociis* canon in interpreting "manager" as including characteristics shared with other entities listed in statute).

**¶24** Section 25 prohibits governmental entities from imposing or increasing "any sales tax, transaction privilege tax, luxury tax, excise tax, [or] use tax" on the privilege to engage in services or on the sales or income generated by those services. These taxes are all calculated based on consumer spending in commercial dealings with persons engaged in a business or occupation. *See* A.R.S. § 42-3052 (imposing luxury taxes at rates tied to quantities of luxury items sold to consumers); *id*. § 42-5008(A) (measuring transaction privilege taxes, which include sales and excise taxes, "by the amount or volume of business transacted" and in amounts determined by applying "rates against values, gross proceeds of sales or gross income"); *id.* § 42-5155(A) (levying a use tax on tangible personal property purchased from out-of-state vendor "as a percentage of the sales price"). The exchange of consideration between a consumer and a business, e.g., money for shoes, is the "transaction" on which these taxes are "based." *See Base,* Merriam-Webster, https://www.merriam-webster.com/dictionary/base (last visited Jul. 12, 2020) (defining the verb "base" as "to find a foundation or basis for" or "to make, form, or serve as a base for"). Consequently, applying the *ejusdem generis* and *noscitur a sociis* canons, "any other transaction-based" fee, as provided in Section 25, can only reasonably mean a fee based on consumer spending for delivered goods or services.

**¶25** Applying this definition, we agree with the City that the trip fees here are not "transaction-based." The "transaction" subject to Section

25 is a passenger's payment of money to a provider in exchange for a ride to or from the Airport. Section 25 prohibits the City from taxing or imposing fees and the like on such transactions. But the Ordinance's trip fees are not based on the transaction between providers and passengers. Neither imposition of the fee nor its amount depends on whether a passenger takes the ride, cancels it, or even pays for it. Instead, the trip fees are based on the providers' use of Airport property in picking up and dropping off passengers at designated sites as recorded by technology-based trip-tracking or provider reports. *Cf. Jacksonville Port Auth. v. Alamo Rent-A-Car, Inc.*, 600 So.2d 1159, 1162, 1165 (Fla. App. 1992) (concluding that a 6% gross receipts fee was "tied exclusively" to off-site car rental agency's use of airport facilities to conduct its business and was therefore an "authorized user fee" rather than a tax).

¶26 The Ordinance's trip fees are best characterized as "authorized-user fees" paid in exchange for the providers' privilege to use Airport property, including dedicated curb space, for conducting business with Airport travelers. *See id.*; *Ace Rent-A-Car, Inc. v. Indianapolis Airport Auth.*, 612 N.E.2d 1104, 1108 (Ind. App. 1993) (characterizing fee imposed on off-site car rental agency as "authorized user fee" based on use of airport roadways to pick up customers in courtesy shuttles, even though fee amount is based on revenues generated by those customers' rentals). The fees are not imposed on trips in the City that do not originate or terminate at the Airport, as would be expected for broadly imposed transaction-based taxes like those specifically enumerated in Section 25. Instead, the fees are imposed only when providers access the Airport and stop at Airport property dedicated to their exclusive use to pick up or drop off passengers. Also, the fee amount differs depending on how usage affects Airport property, further demonstrating that trip fees are tied to property use rather than provider-passenger transactions. Specifically, trips starting or ending at the less-congested PHX Sky Train stations and those using energy efficient vehicles pay discounted fees, while large capacity vehicles operated by non-TNCs pay greater fees. *See* Phx., Ariz., Code § 4-78(A)(2), (6).

¶27 We recognize that a fine line may exist between imposing a fee on a commercial transaction and imposing an authorized-user fee tied to the number of commercial transactions occurring. But that line exists here, and the City falls on the constitutional side. Fees paid for the privilege of using Airport property for commercial purposes must fairly reflect the value for that use. *See* Policy and Procedures Concerning the Use of Airport

Revenue, 64 Fed. Reg. 7696, 7721 (Feb. 16, 1999) ("[T]he FAA interprets the self-sustaining assurance to require that the airport receive fair market value for the provision of nonaeronautical facilities and services, to the extent practicable considering the circumstances at the airport."); *see also Alamo Rent-A-Car, Inc. v. Sarasota-Manatee Airport Auth.*, 906 F.2d 516, 518 (11th Cir. 1990) (stating that for Commerce Clause purposes, user fee imposed on off-site rental car agency renting vehicles to airport travelers must reflect a fair approximation of the agency use of airport facilities and must not be excessive in relation to the airport's costs for that use). The number of trips made by a provider picking up and dropping off passengers evidences usage. Imposing fees tied to that number rather than imposing a monthly or yearly flat fee therefore fairly measures usage value.

**¶28**       Tying trip fees to the number of trips made by providers to and from the Airport reflects the fair value for accessing and using Airport property, depending on the amount of the fee, just as a toll collected at an Airport booth for each trip would. Courts have long recognized tolls as mechanisms for charging commercial entities for use of government property. *See, e.g.*, *Sands v. Manistee River Imp. Co.*, 123 U.S. 288, 293–94 (1887) (describing per-log toll for floating logs down improved waterway as "compensation for benefits conferred" and rejecting analogy to taxes, which are "levied for the support of government"); *Huse v. Glover*, 119 U.S. 543, 548 (1886) ("The exaction of tolls for passage through the locks is as compensation for the use of artificial facilities constructed, not as an impost upon the navigation of the stream."); *Am. Trucking Ass'ns, Inc. v. Alviti*, 944 F.3d 45, 47–52 (1st Cir. 2019) (holding that per-trip fees collected for commercial trucking companies' use of state-owned bridges were properly described as tolls, not taxes).

**¶29**       Other user fees at the Airport are similarly measured. For example, the City imposes landing fees on commercial aircraft on a per-landing rate. *See* Phx., Ariz., Code ch. 4, art. 9, §§ 4-177, 4-179–180. Similar to the providers here, commercial aircraft operators must report their number of landings and related information monthly, which the City's aviation director uses to invoice those operators for landing fees. *See id.* Landing fees, like the trip fees here, are triggered by the use of Airport property and not the transactions between carriers and their passengers that gave rise to the trip. *Cf. Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707, 714 (1972) (stating that regardless whether per-passenger fee imposed by airport on commercial airlines is passed on to passengers, "it is the act of enplanement and the consequent use of

runways and other airport facilities that give rise to the obligation"), *superseded by statute on other grounds as recognized in Nw. Airlines, Inc. v. Cty. of Kent, Mich.*, 510 U.S. 355, 363 (1994).

¶30 The Attorney General argues that the trip fees "are not triggered by one's use of Airport curb space, given that thousands of persons daily use curb space in the exact same manner to drop off or pick up friends or family without having to pay any 'use' fee whatsoever." But neither he nor amici making the same argument offer authority for their implicit premise that a user fee only exists if it is imposed on all users. Reasons exist for not imposing trip fees on non-providers. Friends and family do not individually use Airport property as frequently as providers, they do not commercially benefit from that use, and although they use curb space, it is not dedicated for their exclusive use. The City could impose access fees on non-providers if it so chooses. But whether or not fees are imposed on non-providers, it does not change the fact that the trip fees here are imposed on providers for use of Airport property. *Cf. Evansville-Vanderburgh Airport Auth. Dist.*, 405 U.S. at 717–18 (concluding that exempting per-person enplanement fee for certain class of passengers, e.g. active military members, was not unreasonable and recognizing that "[c]ertainly passengers as a class may be distinguished from other airport users").

¶31 In sum, we hold that "transaction" in Section 25, when read in context, plainly means consumer spending for goods or services. Paying fees to use Airport property for commercial purposes is not "transaction-based," as that term is used in Section 25. For this reason, the City did not violate Section 25 by imposing and increasing trip fees as established in the Ordinance. Because we resolve the constitutional challenge on this basis alone, we need not address the parties' other arguments. We also do not address the reasonableness of the trip fee amounts, as that issue is not before us.

## II. Is the bond provision in § 41-194.01(B)(2) enforceable?

¶32 If the Attorney General petitions this Court to determine whether a local law violates state law or the constitution, "[t]he court shall require the [local government] to post a bond equal to the amount of state shared revenue paid to the [local government] pursuant to § 42-5029 and 43-206 in the preceding six months." § 41-194.01(B)(2). This provision is mandatory. *State ex rel. Brnovich v. City of Tucson*, 242 Ariz. 588, 596 ¶ 32

(2017). Regardless, we have not yet ordered such a bond, and the City did not post one here.

¶33 In *City of Tucson*, the only other case involving § 41-194.01, we expressed "concerns regarding the bond's purpose, basis, practical application, and constitutionality" but ultimately did not pass on its enforceability given that case's procedural posture. *Id.* at 596–97 ¶¶ 32–35; *see also id.* at 608 ¶ 85 (Gould, J., concurring) (concluding the bond requirement is "unenforceable because it is incomplete and unintelligible"). The parties here agree that no bond is required because the Ordinance was stayed, although the bond requirement does not specify such an exception. Regardless, for future guidance, we asked them to brief whether the bond requirement is enforceable.

¶34 The City argues the bond requirement is either an unconstitutional "obstacle to judicial review" or is unenforceable as "incomplete and unintelligible." The Attorney General presumes that the legislature required a bond to "ensure that a municipality or county does not benefit from receiving state-shared revenue while possibly violating state law." He asserts that because staying implementation of the challenged law fulfills that purpose, we should interpret the bond requirement as applying only in the absence of a stay. He also contends this Court may reduce the bond amount in appropriate circumstances. These interpretations, however, are untethered to any language in § 41-194.01 or legislative history and would require us to rewrite the statute.

¶35 When a statute is so incomplete or unintelligible that we cannot divine its purpose and intent, or how to implement it, it is invalid and unenforceable. *See Sw. Eng'g Co. v. Ernst*, 79 Ariz. 403, 414 (1955) (stating that a statute imposing a duty on a public official "must be prescribed in terms sufficient and definite to serve as a guide" for "intelligent execution"); *Cohen v. State*, 121 Ariz. 6, 9 (1978) ("[S]tatutory language must be sufficiently definite so that those who are to execute the law may do so in a rational and reasoned manner."). Otherwise, it could violate due process by failing either to provide sufficient notice of what the law requires or to restrict the discretion of administrative agencies or public officers charged with applying the statute. *See Ernst*, 79 Ariz. at 412–13; *CAVCO Indus. v. Indus. Comm'n of Ariz.*, 129 Ariz. 429, 434 (1981). Or it might require the Court or agencies to effectively "legislate" by supplying material and necessary missing terms not suggested, either expressly or impliedly, by the statutory language, which would violate separation-of-

powers principles. *See Ernst*, 79 Ariz. at 413–14. Before declaring a statute invalid as incomplete or unintelligible, however, we must "us[e] every authorized means to ascertain and give the [statute] an intelligible meaning." *Coggins v. Ely*, 23 Ariz. 155, 161 (1921); *see also City of Tucson*, 242 Ariz. at 610–11 ¶¶ 97–102 (Gould, J., concurring) (discussing the "unintelligibility doctrine").

¶36        The bond requirement in § 41-194.01(B)(2) is so incomplete that we cannot enforce it. Neither the statutory language nor legislative history reveals the bond's purpose or the conditions on which it is based. Does the local government have to post the bond to defend its challenged law in this Court? What happens if no bond is posted? We aren't told. If the local government posts a bond, what does it have to do or refrain from doing to avoid forfeiture? The statute doesn't say. What conditions must exist to exonerate the bond? Does that occur when we issue our decision or, assuming we find a violation, when the local government resolves the violation? We are left guessing. The list of unanswered questions goes on and on.

¶37        The bond provision in § 41-194.01(B)(2) is incomplete and unintelligible and therefore unenforceable. To be clear, we are not declaring the provision unconstitutional. Instead, we simply refrain from attempting to enforce the bond requirement or pass on its constitutionality unless and until the legislature completes it. *See CAVCO Indus.*, 129 Ariz. at 434 n.3 (acknowledging "the simple common law rule that courts will not apply unintelligible laws"). The defects in the bond provision do not impact the remaining provisions in § 41-194.01. *Cf. State Comp. Fund v. Symington*, 174 Ariz. 188, 195 (1993) (explaining severability doctrine). In light of our holding, we do not address the City's additional argument that the bond provision is an unconstitutional "obstacle to judicial review."

## CONCLUSION

¶38        We accept jurisdiction as required by § 41-194.01(B)(2) and hold that the Ordinance does not violate Section 25. We therefore deny the Attorney General's request to declare the Ordinance null and void. We additionally hold that the bond provision in § 41-194.01(B)(2) is unenforceable. Finally, pursuant to A.R.S. § 12-348.01, a mandatory fee provision, we award the City its reasonable attorney fees as the successful party.